UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Shazad Buksh, Krishna Gathani,    )
Gon Saman,                        )
                                  )
            Plaintiffs,           )
                                  )    Case No. 2:21-cv-190
     v.                           )
                                  )
Dr. William Sarchino DPM Foot     )
and Ankle Surgeon, William        )
Sarchino, Southwestern Vermont    )
Medical Center, Southwestern      )
Vermont Health Care,              )
                                  )
            Defendants.           )

## OPINION AND ORDER

Plaintiff Krishna Gathani ("Gathani") brought this case, which is made up of claims against defendants Southwestern Medical Center and Southwestern Vermont Health Care (collectively "SVMC"), including claims of hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); retaliation under the Healthcare Whistleblower's Protection Act ("HWPA"); Title VII retaliation; breach of the implied covenant of good faith and fair dealing; Vermont Occupational Safety and Health Administration ("VOSHA") retaliation; and retaliation and discrimination on the basis of his race, ethnicity, and religion, in violation of Vermont's Fair Employment Practices Act ("FEPA").  Gathani also asserts

claims against defendant William Sarchino ("Sarchino") for violations of VOSHA and FEPA, as well as negligence and tortious interference with a contract.  SVMC and Sarchino now move for summary judgment on all of these claims.  For the reasons set forth below, the Court grants in part and denies in part SVMC's motion for summary judgment, and grants in full Sarchino's motion for summary judgment.

### Factual Background[1]

SVMC is a domestic nonprofit corporation and regional hospital providing a variety of health care services with its principal place of business in Bennington, Vermont.  SVMC operates under Southwestern Vermont Health Care with partnerships with surrounding universities and other health care institutions.

Gathani's ethnicity is Indian, his nationality is American, his religion is Hindu and his dietary preference is vegetarian.

---

[1] This factual summary is derived from the joint statement of undisputed material facts submitted by the moving parties.   In responding to a movant's statement of undisputed facts, under Local Rule 56(b) a party may, if necessary, include a separate and concise statement, in numbered paragraphs, of additional material facts that the opposing party contends cannot be genuinely disputed.  Because Gathani chose not to do so, this summary is based on the movants' statement of undisputed facts and Gathani's opposing statement admitting, denying, or otherwise responding to these facts.  The facts are undisputed unless noted.

ECF No. 246-1 at 52.  He was born in Louisville, Kentucky and grew up there.  ECF No. 246-2 at 1.

## I.  Podiatry Residency Program

From 2014 to 2022, SVMC sponsored a Podiatry Residency Program (the "Program") founded by Sarchino.  Sarchino, who was an employee of SVMC, served as the Program Director and Dr. James Poole served as the Assistant Director.  The Program trained two residents per year over a total of three years per resident.  The parties agree that the Program has trained a diverse group of residents and that, out of the 16 total residents that the Program trained, exactly half have been non-white residents who represented a variety of racial and ethnic backgrounds.  The Program included a series of rotations in different specialties.  These rotations were typically four to five weeks in duration, and some occurred at affiliated institutions and required residents to travel to other locations.

During the fall of 2018 Gathani interviewed at SVMC, which he had ranked in his top ten programs, and he said he had a "good interview" with Sarchino and Poole.  Gathani matched with SVMC in phase one of the process.  To accept his position in the Program, Gathani received and signed a Physician Postgraduate Training Agreement for a 36-month podiatric residency training commencing on July 1, 2019 through June 30, 2022.  This

agreement set forth the terms of the residency, including resident responsibilities, the evaluation process, and salary and benefits.  *See* ECF No. 223-5.  The agreement also described the Residency Training Committee ("RTC"), stating in part that:

> SVMC has established a Residency Training Committee to evaluate the program's educational content and the progress and performance of each Resident Physician. Resident Physician shall be evaluated by attending staff physicians to whom he/she is assigned at the end of each rotation, and these evaluations and other factors shall be considered annually by the committee.  Remediation methods for unsatisfactory resident performance may be undertaken […] After each annual review, the committee will issue its determination as to whether Resident Physician performed satisfactorily and is educationally qualified to proceed in the program.

ECF No. 222-9 at 3-4.

Gathani also received, and signed, SVMC's Employee Guidebook as well as an acknowledgement confirming that he received, read and understood the Employee Guidebook.  *See* ECF No. 223-8.  The acknowledgement included the following statement: "I understand that Southwestern Vermont Health Care is an 'at will' employer."  *Id.* at 2.  The Employee Guidebook describes SVMC's Equal Employment Opportunity Policies, including reference to its Anti-Discrimination/Harassment and Sexual Harassment, Anti-Discrimination, and Reasonable Accommodation policies.  ECF No. 223-9.

Gathani also received a copy of the Program's Podiatric Residency Training Manual.  ECF No. 223-12.  The Manual

contained a Dress Code section that stated: "White coats: White coats are recommended, and must be clean and neat."  ECF No. 223-12, at 9.

## II.  Gathani's Residency

Gathani began his residency at SVMC on July 1, 2019.[2]  By the fall of that year, Sarchino had discussed with Gathani complaints about Gathani not wearing his white lab coat; however, the parties dispute the nature of the complaints.  *See* ECF No. 246-1 at 12-13.  Also at the start of his residency, Gathani failed to always communicate with attendings regarding his attendance at various procedures.

In November or December 2019, Gathani met with Kevin Dailey ("Dailey"), SVHC's Vice President of Human Resources, to discuss his concerns about Sarchino's behavior towards him.  At this meeting, Gathani did not use the word "discrimination," but he later testified at his deposition that: "obviously talking about being, you know, being taken out of surgeries, being taken out of education, feeling like I'm being treated differently than everyone else, I would think those [sic] would send an alert or like a red flag that something's going on here" (ECF No. 223-4 at 230); he also testified that: "I think we talked about how he was treating us was unfair.  We talked about being taken out of

---

[2] His co-resident was Gon Saman.  Shazad Buksh was a resident a year ahead of Gathani.

surgery, being taken out of academics, not understanding why. About the threatening of being fired." ECF No. 246-23 at 39-40. Gathani said that he did not tell Dailey about the discriminatory language Sarchino used, because he was afraid of consequences.

Gathani testified at his deposition that he observed Sarchino using surgery opportunities as a punishment for those in the Program:

> [I]n the beginning months whenever we were being reprimanded, his, always his punishment to us was, especially to, well to me, speaking of me directly, he would say no surgery this Friday for you. You know, like one example was if we didn't wear a white coat, no surgery, no surgery for you if you're not going to listen to me. And if there ever was an other, like whenever we had the meetings with Poole and Sarchino, like one other time was I guess Sandy had sent an e-mail that we didn't schedule our—we went over her to reschedule our, our head shots; and his punishment to that was no surgery. And so this, this directly impacted our education and my surgery numbers. And to constantly have this keep happening, like there was no rhyme or reason, there was no corrective action plan, there was nothing like that; it was just a constant when you get upset, no surgery for you.

ECF No. 246-23 at 65-66. Gathani also described Sarchino reserving an extra-intense level of anger when interacting with the three plaintiffs in this case:

> [I]n all our experiences with Dr. Sarchino, obviously all the residents have a different experience, he never gets, gets that angry with anyone else; it was always Gon, Shazad or me where it always had to go one step higher. And there was like no way of bringing him back from that. When he starts to go on that rant, like that, just that rant, like he would never

6

get that mad with anyone else.  And it always was the same type of words; why do you have to go against me? What is it with you people, like why can't you just listen and do what I say?  Like you work for me, I own you.  Like it was just these things that you shouldn't have to hear, especially if, if you're not doing something truly wrong, if you're not—if he's giving you an instruction and you are following it but you have a question, like this isn't a moment to think that I'm trying to go against you, it's just truly a clarification.  And this happened multiple times with either Cody present, Gon, Shazad, me, in his office and in the hospital.

ECF No. 246-23 at 37-38.[3]  Gathani also explained that Sarchino

would:

---

[3] Gathani further expounded on the type of yelling Sarchino directed at him in his deposition:

Q. I believe you testified that Sarchino's short fuse and bad temper was evidence of discrimination; is that correct?
A. No, I wouldn't say that.  That's like two different things.  I would say that some of the acts that, some of the things that he would say were discriminatory; but he did have a, a pattern of being short-fused and tempered, short-tempered.
Q. Was Sarchino yelling at you evidence of discrimination against you?
A. Again, that's, when, when you grew up and you, you constantly do, you see the unbiased and inherent bias that people have against you for your color, you start to see patterns.  The way he yelled at me was not the way you yell at someone to reprimand them or to scold them for doing something wrong.  The way he yelled at me was just straight out of anger that was unprovoked for something as simple as I don't feel comfortable doing this Op Report because it is not legal for me to do this when I was not first assist or part of doing majority of the surgery.  That would be a simple answer in any physician's eyes as yeah, you don't do that; whoever did the surgery should do it.  But the way it was like a switch just went off, and the amount of anger in his voice, you could almost sense and feel the type of hatred.

> [M]ake comments on how Gon and I looked so same, we're
> the same person.  We both come from different
> continents.  How, how we must not be able to read;
> that was a constant thing.  Because my grammar is kind
> of really broken; when I type my English is
> unfortunately really bad.  Sometimes he would just
> straight make constant comments about that; oh, you,
> you can't read, do you know at least how to write
> that?

ECF No. 246-23 at 30-31.

In January 2020, Sarchino's wife, who worked in Sarchino's private practice, made comments about the "smell of onions" in Gathani's food because she had a "sensitive palate."  Gathani did not report these comments to Human Resources.

According to Gathani, Sarchino didn't like the way Gathani smelled after Gathani would eat Indian food, and Sarchino told Gathani that you "have to at least eat meat once, you have to try it."  Gathani told Sarchino to stop making comments about his food, and Sarchino did (for that encounter, but not permanently).

Gathani also testified that Sarchino made fun of him for other attributes, including his name:

> [L]ike Krishna is a unisex name; so a female name.
> The on sai; which is something that's a religious
> slogan or prayer we say.  Constantly making remarks
> about my license plate for that.  That I must be in
> love with Gon Saman because om sai and I can't spell
> because that spells Saman's name somehow, which I
> don't see how.  How I was vegetarian due, because of
> my religion.  Arranged, how in our culture usually you
> have arranged marriages; and you wouldn't, you won't

ECF No. 246-23 at 56-57.

find a girl otherwise that's why you need to have an arranged marriage, even though he knew I was engaged already to my fiancée at the time.

ECF No. 246-23 at 31-32. Gathani explained that Sarchino made fun of his name less than five times, and after that Sarchino decided to call him Kris. Gathani told him "it's just Kirshna; like there's no other girl, it's just me, I'm a guy. And then it was just like, you're, you're Kris, you're Kris. And so that started off to just, that was my name now; it was not Krishna anymore, it was Kris." *Id.* Gathani also remembered Sarchino making comments about Gathani's beard, and—in August or Setember of 2019—telling him that he looked "like a terrorist." ECF No. 223-4 at 126.

On January 2, 2020, Gathani had his 6-month review with the RTC. Gathani received a generally positive review, and it was noted that his performance had improved since the fall. Sarchino completed a 6-month evaluation for Gathani in which he ranked Gathani "good" or "excellent" in every category, and Sarchino recommended that he "should continue" the program. On January 16, 2020, the RTC unanimously recommended that Gathani advance to his second year of the residency program.

Also in January of 2020, on or about January 18, Gathani and other residents met with Dailey to share their concerns with the Program. Their concerns included SVMC's billing and insurance practices, medical decisions of Sarchino, complaints

9

about staff, and complaints about Sarchino's "belligerent, belittling attitude towards residents." The defendants assert that no allegations of discrimination were discussed at this meeting. Gathani contends that, even though the discriminatory allegations were not included in the follow-up memo, both Gathani and Buksh testified that the complaints discussed at the meeting included the unequal treatment of plaintiffs because of national origin, ethnicity and race. *See* ECF No. 246-1 at 25.

On January 20, 2020, the residents spoke with Mitchell Baroody ("Baroody"), SVHC's Chief Compliance Officer, about their concerns with the program; they brought up similar concerns to those brought up in the meeting with Dailey. Baroody informed the residents that they would not be retaliated against for these complaints, and that if they were to be retaliated against they should report it immediately. Baroody also conveyed that he would investigate their concerns.

On January 22, 2020, Dr. Carl Dobson, SVMC's Chief Medical Officer, contacted the Council on Podiatric Medical Education ("CPME") to speak with someone confidentially about concerns raised that week by residents of the Program; the next day Dobson emailed CPME a summary of the call, noting that he was told that the Program should continue to use internal resources to investigate and resolve the issues.

10

On February 5, 2020, Dailey sent Sarchino and Poole a memorandum outlining Human Resources concerns.  *See* ECF No. 223-27.  Dailey met with Sarchino and Poole on February 6, 2020 to discuss the concerns.  That same day, the residents attended a monthly meeting and learned that SVMC had contacted CPME to do a targeted audit in response to their concerns.

On Fridays, first year podiatry residents in the Program had the opportunity to attend surgeries with Sarchino.  The parties dispute whether surgical opportunities were reduced for all residents in 2020 due to COVID-19.  On February 26, 2020, Sarchino sent a text message to all residents that stated in relevant part: "There is no didactic in my office this week[.] As of now, for the time being, you are all to stay in your rotations on Friday[.]  Who ever is on rotation with me will be assisting me in surgery."  ECF No. 223-18.  The parties dispute whether Gathani himself understood the text message to be retaliatory or caused by COVID-19.  *See* ECF No. 246-1 at 17-18.

After the February text, Gathani performed 6 surgeries in podiatry cases with Sarchino while he was rotating with Sarchino.[4]

---

[4] In an affidavit submitted in support of his response to the motions for summary judgment, Gathani explained his view of his surgery numbers:

> I disagree with Dr. Sarchino's interpretation of my surgical log.  The log shows that from July 1, 2019 to February 26, 2020, I had 52 podiatry surgical cases

Gathani testified that over the last four to six months of his time at SVMC, from March 2020 onward, he had little interaction with Sarchino because Sarchino stopped talking to him. *See also* ECF No. 246-2 (Gathani Affidavit)("After our complaint, Dr. Sarchino started treating me considerably worse than before.  I was removed from didactics and had reduced rounding with loss of education. He avoided eye contact, would not speak with me and just seemed like he hated me.").  Around this time, Gathani also remembers being denied access to Sarchino's office, which was where "our surgical didactics would

---

with Dr. Sarchino, but only one case with him after February 26, 2020, to June 3, 2020.  The log also shows that from July 1, 2019 to February 26, 2020, I had 16 podiatry surgical cases with other physicians including orthopedic cases, and 8 such cases from February 26, 2020 to June 3, 2020.  This means that before Dr. Sarchino started retaliating on February 26, 2020, 76% (52 out of total of 68) of my podiatry surgical experience was with Dr. Sarchino.  After February 26, 2020, only 11% (1 out of 9) of my podiatry surgical experience was with Dr. Sarchino. This significant drop was not because of the pandemic. Assuming for discussion and per SVMC's claim that February 26, 2020, was the start of pandemic restrictions at SVMC, I had 8 non-Sarchino surgical cases in the three months to June 3, 2020, or an average of 2.6 cases per month.  For the "pre-pandemic" period of July 1, 2019, to February 26, 2020, I had 16 non-Sarchino cases in 8 months or an average of 2 cases per month.  In other words, the pandemic made no difference in my podiatry surgical cases with other physicians.  The significant drop in my numbers after February 26, 2020, was because of Dr. Sarchino, not the pandemic.

ECF No. 246-2 at 4-5.

12

occur" and "where the podiatry textbooks were for us to be able to do our, to read for surgeries and to even work on doing research."  ECF No. 246-23 at 67.

At his deposition, Gathani testified that he spoke with Dailey at some time—perhaps March of 2020—and told him that "nothing has gotten better" and Sarchino "won't even look at me or even have a conversation with me" and he was "still not doing any surgery" or "any academics."  ECF No. 246-23 at 44.  He also asked for someone else (besides Sarchino) to supervise the residents.  *Id.* at 47.

On March 24, 2020, the RTC decided that Saman would not have his contract renewed and would not be permitted to return the following year.[5]  The RTC also unanimously agreed for Gathani to continue on to the second year of his residency.

Also in March of 2020, Gathani was exploring other programs.  He researched openings in residency programs via a national registry that shows open vacant residency spots. Gathani had begun specialty training in Podiatric Medicine and Surgery Residency with added accreditation in Reconstructive Rear Foot Arthrodesis; he did not see any second-year residency openings in this specialty at the time he was applying for new residency programs.  Therefore, he applied to one program: a

---

[5] Saman appealed his termination to the Grievance Committee, and he was reinstated on May 19, 2020.

13

first-year residency program at the James A. Haley Veterans'

Hospital in Tampa, Florida.  Gathani applied by submitting his

CV to an attending physician at the hospital.  By March 19,

2020, Gathani had been accepted and on March 20, 2020 the

program sent him on-boarding paperwork.  Gathani verbally

confirmed that he accepted the residency position, but he states

that at that time he had not made a final decision as to whether

he wanted to stay at SVMC or go to Florida as a first-year

resident.

On April 3, 2020, Gathani and Dailey met at Gathani's

request.  Gathani states that he was "having truly emotional,

like I was in a bad mental space with everything that was going

on, and I really was contemplating if I should even continue

residency or just stop with how things were going."  ECF No.

246-23 at 13.  Dailey has stated that Gathani shared that he was

accepted into another podiatry residency program in Florida in

April 2020.  ECF No. 223-26 at 6-8.[6]

On April 27, 2020, Gathani submitted a complaint with the

CPME.  ECF No. 223-38.[7]  On May 22, 2020, Gathani filed a

---

[6] Gathani generally responded that "Dailey's credibility is at
issue when his testimony is offered as favorable for SVMC and/or
Sarchino defendants, and his testimony should be weighed by the
jury."  ECF No. 246-1 at 42.  It is not clear which exact fact
Gathani disputes.

[7] Gathani "included" these complaints in his affidavit submitted
in support of his response to the motions for summary judgment.
ECF No. 246-2 at 3 ("I provided a summary to CPME and EEOC of

14

complaint with the EEOC against SVMC alleging discrimination on the basis of race, color, religion, national origin and retaliation.  ECF No. 223-39.

The defendants contend that on or about May 15, 2020, SVMC posted on the national database that they had one second-year residency spot available for the upcoming year.  Gathani disputes this, pointing out that "Sarchino posted *two* open positions for second year residents in the upcoming 2020-2021 program year."  When the posting was made, Saman had been informed by the RTC that he would not be permitted to return the next year; however, Baroody had informed Dailey over text that the separate Buksh RTC decision had been reversed on May 7, 2020.[8]

Gathani did not ask about this posting.  At his deposition, he explained that Sarchino was not speaking to him and that he had been told that HR would not assist the residents anymore

how Dr. Sarchino treated us and I see those are included in SVMC's exhibits as my complaints.  Those are true and accurate, and I include them in my affidavit.").

[8] Gathani contends that, given this text, the reasonable inference would be that "Mr. Baroody also knew 'unofficially' in advance that Dr. Saman will win his appeal.  With the close working relationship of these actors, the reasonable inference is that word got to Sarchino by May 7, 2020, and he listed the two positions open for the next year class of 2020-21 to make it clear to Drs. Saman and Gathani that their days in his program were numbered."  ECF No. 246-1 at 43.

15

until CPME had completed their investigation, so "we had no one to go to after that."  ECF No. 223-4 at 46.

On May 20, 2020, Gathani resigned from the Program via a letter, in which he wrote:

> Please accept this as official notice of my resignation.  My last day will be June 28th 2020.
>
> As you are aware, this past year, we have had multiple problems with the Podiatry Residency Program here at SVMC.  From the multiple threats of firing, the hostile work environment, the discriminatory practices, to preferential treatment of non-minority residents, and withholding of surgical and education experiences; directed towards the minority residents. This includes but not limited to the behavior of the Program Director, Dr. William Sarchino, directed towards the minority residents.  The unprofessional and disrespectful behavior, lack of communication and continued conflict has led to my decision to resign from the Podiatry Residency Program here at Southwestern Vermont Medical center.  These issues and concerns have been brought forth multiple times over the course of the year, however no corrective action or resolution has been achieved.
>
> Due to these issues and conflicts, including but not limited to; termination of my co-residents contract.  This has affected my ability to continuing [sic] working here.  In fact, to the point where I do not feel certain about my future here.  It is clear to me, after one year that these issues have not been resolved or definitive plan for the future has not been addressed.  It has come to the point where I do not feel welcomed anymore. Therefore, I feel that resigning is the best option for me.
>
> My last day at Southwestern Vermont Medical Center will be 06/28/2020.  I would be happy to meet and discuss any questions you have.  I would appreciate that all my evaluations' and documentations' be copied to me as well, along with certificate of successful completion of PGY-1 year.

16

ECF No. 223-35.

On June 28, 2020, Sarchino provided Gathani with a signed letter showing that he had successfully completed his PGY-1 year with the Program.  During his employment, SVMC did not decrease Gathani's pay, did not demote Gathani, and did not decrease Gathani's benefits.

At the end of his first year, Gathani had 99 podiatry surgeries and 130 total surgeries.  At his deposition, Gathani testified that: "There's a certain amount that you're supposed to get each, of each total over the course of your three years.  So if you compare other, the other residents before us, like the second year and the third years, our numbers were significantly lower than theirs."[9]  ECF No. 223-4 at 213.

During his residency, Gathani engaged in exchanges in text messages with others and in those text messages he used the n-word, referred to others with phrases such as "African who like whiter than them" and "white washed bitch", and also used terms such as "bitch," "ho," and "stupid fuck."[10]

---

[9] Gathani then went on to agree that for the other classes, COVID-19 was not impacting their first years.  Gathani has not attached the logs of other residents or brought them to this Court's attention besides citing to his own testimony.  *See, e.g.,* ECF No. 246-1 at 21.
[10] Gathani filed an affidavit in support of his response to summary judgment in which he stated:
> Dr. Sarchino made derogatory comments about my name, appearance, religion, family traditions, and my vegetarian diet.  He made similar comments to Gon

17

## III. Radiation Exposure

In an affidavit submitted in support of his response to the motions for summary judgment, Gathani stated:

> One part of my ongoing emotional worry is that Shazad Buksh developed a bladder lesion that was believed to be cancer and he has had to monitor his bladder with a procedure that can be very uncomfortable.  Shazad had the same unsafe x-ray exposure at Dr. Sarchino's office as I did.  There was no lead apron for the residents and we had to keep the patients steady while standing on the small x-ray platform.  The x-ray machine hinges were old and not serviced.  It was unstable and we had to hold it in place while having the patient place his/her hand on our shoulder to keep steady.  I was often kneeling to do this.  It meant that the x-ray applicator was close to my bladder.  Fortunately I have not developed any symptoms of bladder cancer but I know from my medical training that cancer is a complex disease and there is risk.  Ionizing radiation is known to be carcinogenic.  I have worried and continue to worry about my health because of the x-ray exposure at Dr. Sarchino's office.  I watch for symptoms but the type of intrusive surveillance that Dr. Buksh has with his bladder is not indicated.

---

Saman.  As an Indian-American, my appearance and even name can trigger hostility from prejudiced individuals.  That experience is shared by many ethnic people in this Country and I had my share of it.  The culture outside of home while growing up could be rough and locker-room type talk was common though with age and maturity it is thankfully fading.  In my private text messages with other residents that type of language was mutually used.  But Dr. Sarchino was not bantering with locker room talk; he was my employer/supervisor who in a meanspirited way was demeaning and disrespecting me.  Even without use of racial language, Dr. Sarchino had a tendency to want to put down and embarrass the residents in front of patients and colleagues.
ECF No. 246-2 at 2.

ECF No. 246-2 at 7.  Gathani stated at his deposition that he does not believe that Sarchino intentionally intended to harm anyone via his x-ray practices.  Gathani has never seen a medical provider with respect to his alleged radiation exposure. He does not have any evidence that he has been physically harmed as a result of the alleged radiation exposure in Sarchino's office.

On June 23, 2020, Buksh—who had previously filed a Vermont Occupational Safety and Health Administration ("VOSHA") complaint for alleged unsafe x-ray practices—encouraged Saman and Gathani to file their own complaints.  He wrote in part: "You both will need to make a complaint and then have a retaliatory action within 30 days by svmc or Sarchino.  If you can find an instance where all those things will be possible, then do it."  ECF No. 223-41 at 4.  Gathani did not file any complaints with VOSHA, nor did he testify at any VOSHA proceeding.

## IV.  Subsequent Residencies

On July 6, 2020, Gathani began residency at the James A. Haley Veterans' Hospital.  Gathani entered this program as a first-year residency student, as the program did not have a second year residency seat available at the time that he began. Saman began as a first-year resident at the same program as well.

19

Defendants assert that in late 2021 and early 2022, Gathani and Saman were investigated for significant instances and uses of profane, racial, misogynistic, and homophobic slurs against others at the James A. Haley Veterans' Hospital residency program and that the Summary Review Board conducted an investigation of the alleged misconduct. The Board unanimously recommended that Gathani's residency be terminated due to the findings of their investigation which "indicate significant issues with communication, interpersonal relationships, inappropriate language and conduct" and the Board's summary points out significant instances and uses of profanity, racial, misogynistic, and homophobic slurs against others. On March 31, 2022, Gathani was provided with a Notice of Summary Review Board Findings by David Dunning, noting that David Dunning accepted the recommendation of the Board to terminate Gathani's residency. Gathani broadly objected to all facts in the defendants' statement of facts regarding this investigation, writing the same objection for eight statements of fact: "Objection as not relevant and intended to prejudice Dr. Gathani. Drs. Saman and Gathani denied these allegations and were not provided a hearing with due process to challenge the witnesses and present their witnesses who supported their denials." *See* ECF No. 246-1 at 65-67. Gathani wrote in an affidavit that "At the Florida program, there was some

20

unfortunate rivalry and jealousy amongst the student and resident, and it created divisions and animosity.  I am confident that if we had gone to a hearing with witness testimony and other evidence, we would have been exonerated." ECF No. 246-2 at 7.  Within a week after receiving this decision, Gathani resigned from the residency program at the James A. Haley Veterans' Hospital for "personal reasons." ECF No. 223-4 at 7, 191.

On May 2, 2022, Gathani began a different residency as a second-year resident at Coney Island Hospital in Brooklyn, New York.  Gathani completed this residency.

Gathani currently lives in Kentucky, and holds medical licenses in Kentucky and Indiana.  He has been a podiatrist in private practice at Nair Internal Medicine and Podiatry since November 2023, approximately six weeks after his residency at Coney Island ended.

## Discussion

### I.   Legal Standard

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the

light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

## II.  Retaliation Claims (SVMC)

Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  In order to make out a *prima facie* case for a retaliation claim under Title VII, a plaintiff must show that: (1) he was engaged in a protected activity; (2) SVMC was aware of that activity; (3) he was subjected to a retaliatory action, or a series of retaliatory actions, that were materially

22

adverse; and (4) there was a causal connection between the alleged adverse action and the protected activity. *See Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).

In addition to challenging Gathani's Title VII claim, SVMC is moving for summary judgment on his claims under the Healthcare Whistleblower's Protection Act ("HWPA"), Vermont's Occupational Safety and Health Administration ("VOSHA"), and Vermont's Fair Employment Practices Act ("FEPA"). HWPA defines a "retaliatory action" as "discharge, threat, suspension, demotion, denial of promotion, discrimination, or other adverse employment action regarding the employee's compensation, terms, conditions, location, or privileges of employment." 21 V.S.A. § 507(a)(7). Under VOSHA, "[n]o person shall discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of the employee or others of any right afforded by this chapter." 21 V.S.A. § 231(a). FEPA makes it unlawful for an employer to "discharge or in any other manner discriminate against any employee" when the employee "has opposed any act or practice that is prohibited under this chapter." 21 V.S.A. § 495(a)(8)(A). Neither party argues that, for the purposes of

23

this motion for summary judgment, HWPA, VOSHA, or FEPA has a different standard or burden of proof than Title VII.  *See also Gallipo v. City of Rutland*, 2005 VT 83, ¶ 15 ("Under FEPA, the standard and burdens of proof are identical to those under Title VII").

SVMC argues that Gathani cannot show step three of his *prima facie* case--that he suffered an adverse employment action—where Gathani chose to resign and was not constructively discharged.  Gathani responds that he *was* constructively discharged, as well as excluded from the podiatry office, and that his access to surgeries and other educational opportunities were curtailed.  Although the Court previously concluded that these allegations were enough for Gathani to survive SVMC's motion to dismiss, it now finds that, even when viewed in the light most favorable to Gathani, there is not enough evidence of an adverse employment action for his claims to survive summary judgment.

"The antiretaliation provision of Title VII, unlike the antidiscrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Banks v. GM, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (internal quotation marks omitted).  In order to "satisfy the third element of a *prima facie* retaliation case, a plaintiff need only show that the allegedly retaliatory actions, taken either

24

singularly or in the aggregate, were 'materially adverse'" and "would dissuade a reasonable employee from making a complaint of discrimination." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180, 181 (2d Cir. 2023).

When compared to adverse actions in the discrimination claim context, retaliatory adverse actions are both more and less strict in different ways. Again, the retaliatory actions considered may be broader and extend beyond the terms and conditions of employment. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224-25 (E.D.N.Y. 2014). On the other hand, anti-retaliation actions must be "materially adverse" and cause "significant" harm—a standard that the Supreme Court has not extended to Title VII's anti-discrimination provision. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357-58 (2024).

First,[11] though Gathani cites his lack of surgical experience as a significant harm that would dissuade a

---

[11] Gathani also points to adverse actions that were taken against Buksh and Saman. The Court understands that Gathani is arguing that the actions were taken as "group retaliation to target three out of the five complaining residents by their stigmatizing features as 'one person' of Southeast Asian/Middle-Eastern ethnicity" (ECF No. 246 at 7); however, Gathani does not cite to any caselaw that states that an adverse action taken against one individual may also count as an adverse action taken against another. So, for example, though the Court appreciates Gathani's argument that the termination of Saman adds background to the retaliatory scheme Gathani is setting forth, and takes note of that fact, the Court will not count the termination of Saman as one of the adverse actions taken against Gathani himself.

25

reasonable employee from making a complaint of discrimination, he does not cite evidence to back up this claim.  Gathani cites to the text sent by Sarchino in February 2020, limiting surgical cases.  However, this text was sent to all residents.[12] See Carr, 76 F.4th at 180 ("absent allegations of more direct hostile conduct, a reasonable employee would not be dissuaded from taking protected action simply because they are subject to the same policies as other employees.").  Gathani points out that he had a drop in the number of surgeries he performed with Sarchino:

> Gathani's review of his surgical log shows that before Dr. Sarchino started retaliating on February 26, 2020, 76% of his podiatry surgical cases [were] with Dr. Sarchino. [] After February 26, 2020, only 11% of his podiatry surgical experience was with Dr. Sarchino. [] This significant drop was not because of the pandemic. []  Assuming for discussion and per SVMC's claim that February 26, 2020, was the start of pandemic restrictions at SVMC, the log shows that with other physicians, Dr. Gathani's podiatry surgical cases averaged 2 per month before February 26, 2020, and 2.6 per month for the remainder of his time at SVMC to June 3, 2020.

---

[12] Gathani argues that "SVMC's argument that the February 26, 2020, text was sent to all the residents misses the point that the Friday surgeries were the only dedicated podiatry surgery days for first year residents."  ECF No. 246 at 9.  However, Gathani did not submit evidence of previous first year resident surgery numbers for this Court to consider, because Gathani did not choose to submit a separate statement of undisputed material facts in his response to the motion for summary judgment, and instead he simply stated that "Gathani and Saman were the only first-year students and therefore their surgical experience cannot be compared to another resident."  Id.

26

ECF No. 246 at 9. However, it is undisputed that Gathani completed 99 podiatry surgeries and 130 total surgeries in his first year.  The Court does not find that the decrease in surgical cases with Sarchino that Gathani has identified amounts to an adverse action.

The Court finds that none of the other actions are materially adverse such that they would dissuade a reasonable employee from making a complaint of discrimination.  The changed keys to Sarchino's office are not materially adverse.  Though unpleasant, Sarchino's behavior towards Gathani at the end of his first year—ignoring him, seeing him only in passing—is not materially adverse.  Nor do the allegations of Sarchino's belittling remarks rise to the level of adverse action.  *See, e.g.*, *Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 337-39 (S.D.N.Y. 2019) (finding allegations of a changed workload and "yell[ing] and scream[ing]" insufficient to withstand a motion to dismiss on a Title VII retaliation claim).

The Supreme Court has explained that Title VII's antiretaliation provision does not "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington N.*, 548 U.S. at 67.  Ultimately, even when viewed in the light most favorable to Gathani, the Court concludes that that the adverse

27

actions identified by Gathani—even when considered in the aggregate—do not amount to *materially* adverse actions that would dissuade a reasonable employee from making a complaint of discrimination.[13]   SVMC did not terminate Gathani, demote Gathani, or decrease his pay or benefits.  On January 2, 2020, Sarchino marked Gathani's progress as "good" and "excellent." The RTC unanimously voted to promote Gathani to his second year of residency at the program.  The Court cannot say that the evidence marshalled by Gathani amounted to a "materially adverse" action causing "significant" harm that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 63, 68.

Nor was Gathani constructively discharged.  The "constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt

---

[13] The Court is granting summary judgment on the retaliation claims but denying summary judgment on the hostile work environment claim.  This is partly because—as far as the Court can see based upon the record presented by the parties—the remarks that make up a large part of the hostile work environment claim were already being made before Gathani engaged in the protected activity of complaints.  An adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before the plaintiff engaged in the protected activity.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

28

compelled to resign." *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 208 (2d Cir. 2017); *see also Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."). Constructive discharge is a "high standard," and "such a claim requires the employee to show both (1) that there is evidence of the employer's intent to create and intolerable environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Id.* "[A] constructive discharge claim can be premised on the cumulative effect of a number of adverse conditions in the workplace." *Terry v. Ashcroft*, 336 F.3d 128, 153 n. 24 (2d Cir. 2003). "Constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of [his] assignments or criticism of [his] work, or where the employee found the working conditions merely difficult or unpleasant." *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020).

Gathani does not have sufficient evidence to meet this "high standard." He points to HR's inaction, Sarchino's personal hostility to him at the end of his time in the Program

29

(refusing to talk to or look at Gathani), Sarchino's "efforts to frustrate and defeat the very training and educational purpose of the residency," and "the posting of" the open position for the next term.  Even if it were reasonable to assume that the job posting were for his own residency position, Gathani had at the time of the posting been promoted unanimously by the RTC and had secured a separate residency position.  A reasonable person would not have found such work conditions, while a posting was put online, intolerable.  *Rother v. NYS Dep't of Corr.*, 970 F. Supp. 2d 78, 93 (N.D.N.Y. 2013) ("apprehension of future termination is insufficient to establish constructive discharge—instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast").  The Court holds that no reasonable juror could find that these facts amount to constructive discharge.[14]

As discussed below, the Court is granting summary judgment on the retaliation claims, but denying it on the hostile work environment claim.  The Court does this for two reasons.  First,

---

[14] Gathani cites to *Groom v. New York State Dep't of Corr. & Cmty. Supervision*, No. 1:22-CV-01080 (AJB/ML), 2025 WL 2772054, at *8 (N.D.N.Y. Sept. 29, 2025) in his response brief.  In that case, the district court ultimately found that "even viewed in the light most favorable to her, Groom's allegations that defendants acted in bad faith by questioning whether she sat in bodily fluids, forcing her to use vacation time when she could not return to work, and disputing her worker's compensation claim—even considered cumulatively—do not meet the threshold necessary for constructive discharge."  *Id.*

and most importantly, some of the conduct described in the hostile work environment claim is conduct that Gathani contends happened over the entirety of his time at the Program, not conduct that happened after he engaged in protected activities. Second, district courts have observed that the standard for the "intolerable" working conditions of constructive discharge is a higher standard than that used for a hostile work environment. *See Barzman v. State Univ.*, No. 3:22-cv-367 (ECC/ML), 2026 WL 880209, 2026 U.S. Dist. LEXIS 68835, at *35 (N.D.N.Y. Mar. 31, 2026) (citing *Ferraro v. Kellwood Co.*, No. 03-cv-8492, 2004 U.S. Dist. LEXIS 23482, 2004 WL 2646619, at *7 (S.D.N.Y. Nov. 18, 2004)); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73-74 (2d Cir. 2000) (discussing, without deciding, whether constructive discharge may require a level of conduct that the hostile work environment level of conduct is not necessarily sufficient to demonstrate).

### III. FEPA Discrimination Claim (SVMC)

SVMC also moves for summary judgment on Gathani's claim of discrimination under FEPA.[15]   The Vermont Supreme Court has explained that:

Under VFEPA, the standard and burdens of proof are identical to those under Title VII [of the United States Code].  In general, to make out a prima facie case of employment

---

[15] Gathani brings a claim of retaliation and discrimination under FEPA, as his seventh cause of action.  *See* ECF No. 124 at 15. Gathani did not bring a Title VII discrimination claim.

31

discrimination, the plaintiff has the burden of establishing four elements.  He must demonstrate that: (1) he was a member of the protected group; (2) he was qualified for the position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding this adverse employment action permit an inference of discrimination.  Plaintiff's burden at this stage is relatively light.

*Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17 (internal quotation marks and citations omitted).  As set forth above, an adverse employment action in the discrimination context had involved a showing of a "material change in the terms and conditions of employment," *id.* (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)), though the Supreme Court has more recently explained that a showing of a material or "significant" injury is not required (at least in the Title VII discrimination context).  *See Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024).

Gathani argues that "the constructive discharge constituted adverse action"—however, the Court finds that the evidence does not show constructive discharge in this case.  Gathani also points to the "group retaliation" experienced by the plaintiffs: "Dr. Saman terminated, Dr. Buksh held back a year, and Dr. Gathani implicitly fired with his position having been listed as open for his second year by Dr. Sarchino on May 15, 2020…The plaintiffs were deprived of surgical experience while their 'white' colleagues were not subject to retaliation."  ECF No.

248 at 19.  The Court does not find that this constitutes a material change in the terms and conditions of employment.  The Court therefore grants summary judgment to SVMC on this claim.

## IV.  Hostile Work Environment Claim (SVMC)

Title VII "does not set forth a general civility code for the American workplace; but when a workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (cleaned up).  "To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Banks v. GM, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (internal quotation marks omitted).  The Second Circuit employs "a totality of the circumstances approach to evaluate whether an environment is hostile and abusive, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (internal quotation marks omitted).  "To prove a hostile work environment

33

in violation of Title VII, a plaintiff must establish both objective and subjective elements."  *Moll*, 94 F.4th at 228-29. "If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001).

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation omitted).  Generally, when "racially offensive language…is presented in a physically threatening manner," *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal quotations marks omitted), or used consistently over a long period of time, the conduct is deemed sufficiently severe or pervasive.  *Sylla v. New York City Dep't of Educ.*, 664 F. Supp. 3d 311, 325 (E.D.N.Y. 2023) (holding a reasonable jury could find the conduct was severe or pervasive when defendant "subjected plaintiff to consistent racial harassment over the course of seven years by regularly calling plaintiff 'mono' and, on one occasion, placing a banana peel in plaintiff's mop pail.").

34

SVMC argues that Sarchino and SVMC did not engage in severe or pervasive discriminatory conduct, where the "alleged comments were isolated or stopped by 2019." ECF No. 255 at 11. The Court disagrees. Drawing all reasonable inferences in favor of Gathani, he has described many inappropriate comments made by Sarchino and a failure to take action by SVMC. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Moll*, 94 F.4th at 227. The Court finds that the evidence here, including Gathani's testimony about being made fun of for his name and given a new name; being mocked for his diet, religion, and license plate; being told that he could not "find a girl" and thus needed "to have an arranged marriage;" and being told he looked "like a terrorist" are sufficient to survive summary judgment.

SVMC further argues that no reasonable juror could conclude that Gathani considered these minor comments *subjectively* offensive, where he himself used racial slurs in texts with other residents. However, in his affidavit Gathani clarified his perspective on some of the language used:

> The culture outside of home while growing up could be rough and locker-room type talk was common though with age and maturity it is thankfully fading. In my private text messages with other residents that type of language was mutually used. But Dr. Sarchino was not bantering with locker room talk; he was my

> employer/supervisor who in a meanspirited way was
> demeaning and disrespecting me.

ECF No. 246-2 at 2.  The Court will not grant summary judgment to SVMC on the subjective prong.  *See Pardovani v. Crown Building Maintenance Co.*, No. 15-CV-9065 (JPO), 2020 WL 2555280, at *4 (S.D.N.Y. May 20, 2020) ("It is not unheard of for in-group members to simultaneously re-appropriate racialized terminology for use, while maintaining an objection to its use by out-group members.").

The Second Circuit has "repeatedly cautioned against setting the bar too high in establishing the standard for a hostile work environment claim."  *Banks v. GM, LLC*, 81 F.4th 242, 268 (2d Cir. 2023) (internal quotation marks omitted).  Here, viewing the evidence as a whole in the light most favorable to Gathani, the Court finds that, though "rational jurors may disagree as to whether these incidents would negatively alter the working conditions of a reasonable employee," a reasonable person could find the working environment hostile.  *Moll*, 94 F.4th at 235.

## V.    Breach of Good Faith and Fair Dealing Claim (SVMC)

SVMC asks this Court to dismiss Gathani's claim of breach of the covenant of good faith and fair dealing, because his employment, like Buksh's, was at-will.  The Vermont Supreme Court has expressly "decline[d] to recognize the implied

36

covenant of good faith and fair dealing as a means of recovery where the employment relationship is unmodified and at-will." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 23 (1995); *Dicks v. Jensen*, 172 Vt. 43, 52 (2001); *Boynton v. ClearChoiceMD, MSO, LLC*, 2019 VT 49, ¶6 ("Because plaintiff was an at-will employee and she has admitted on appeal that the handbook does not modify her status as an at-will employee, her argument that defendants violated the covenant of good faith and fair dealing by terminating her for a pretextual reason fails.").

Gathani responds that the employment contract was not at-will because there was a termination provision that required due process. The provision states:

> XIII. Termination
>
> XIII-1.   This Agreement may be terminated subject to the due process opportunity extended to the Resident Physician under the provisions of the residency program's Grievance Policy then in effect, if the Program Director determines the Resident Physician has failed to remain in compliance with the conditions of his/her appointment under this Agreement or with applicable SVMC policies, or
>
> XIII-2.   Either party pay [sic] terminate this Agreement, without cause, by giving the other party 90 days advance written notice of termination subject to the Resident Physician at his/her option being able to complete the balance of the annual contract year of his/her Agreement, or at SVMC's election compensating the Resident Physician for the balance of his/her contract year under this Agreement.

ECF No. 223-5 at 6-7.  It is true that "the presumption of an at-will employment contract is a rule of contract construction

37

that can be overcome by evidence to the contrary," including by the institution of "company-wide personnel policies."  *Ross*, 164 Vt. at 19-20; *see also Kubler v. Heritage Auto. Grp., Inc.*, No. 5:16-cv-180, 2017 WL 3730884,  2017 U.S. Dist. LEXIS 187998, at *50-51 (D. Vt. June 14, 2017).  However, Gathani relied upon the due process provision above without addressing the second clause, allowing for termination without cause so long as notice and an option was given to the resident.  Yet this second provision is important.  When confronted with an even longer notice period of 180 days, the Vermont Supreme Court has explained: "While the agreement at issue here is not truly at-will in the sense that there is a written contract that requires a notice period before no-cause termination, we have treated them as equivalents" because "the agreement still left the employer with the power to fire [the employee] with or without cause."  *LoPresti v. Rutland Reg'l Health Servs.*, 2004 VT 105, ¶ 18 (internal quotation marks omitted); ¶ 39.  Under similar reasoning, Gathani is in an equivalent at-will employment contract under which he may not bring a claim for a breach of the covenant of good faith and fair dealing.

Moreover, Gathani argues that SVMC has breached the covenant exclusively through its retaliatory actions.  ECF No. 246 at 22 ("[T]here is no promise in the contract that SVMC will not retaliate.  The retaliatory conduct by SVMC constituted the

38

breach of the covenant as it defeated the common purpose and justified expectation of Dr. Gathani."). This argument brings with it a new issue, because the Vermont Supreme Court has declined to recognize claims for breach of the covenant of good faith and fair dealing where they overlap with public policy claims or retaliation claims. *Cole v. Foxmar Inc.*, 387 F. Supp. 3d 370, 384 (D. Vt. 2019) ("Because Plaintiff's claim that he was terminated in violation of public policy is governed by VOSHA which creates a statutory cause of action, any common law claim based on the same facts and alleging the same legal theory of recovery is preempted."); *Murray v. St. Michael's College*, 164 Vt. 205, 212 (1995) ("Because the bases of this claim are essentially the same as those supporting plaintiff's actionable discrimination claim under § 710(b), the claim is superfluous, and thus we uphold its dismissal."). The same reasoning leads this Court to find that Gathani's retaliation claims would preempt his covenant of good faith and fair dealing claims, where "under Vermont law, where a statute creates a right or remedy unknown at common law, the statutory remedy preempts a common law cause of action," *Boule v. Pike Indus.*, No. 5:12-cv-7, 2013 WL 711937, 2013 U.S. Dist. LEXIS 26588, at *68 (D. Vt. Feb. 27, 2013).

    **VI.  VOSHA and FEPA Claims (Sarchino)**

Sarchino also moves for summary judgment on Gathani's FEPA and VOSHA claims against him, arguing in part that Gathani did not experience any adverse actions.  In responding, Gathani relies upon the same actions he cited to in his briefing in response to SVMC's motion for summary judgment on these issues. Accordingly, the Court grants summary judgment to Sarchino on these claims for the same reasons as those described above.

**VII. Negligence Claim (Sarchino)**

Gathani alleges that Sarchino "breached the standard of ordinary care" when he "exposed Gathani to high levels of radiation without proper protection or monitoring" and that as a "direct and proximate result of [Sarchino's] actions . . . . Gathani has and continues to suffer damages."  ECF No. 124 at 15.  However, at summary judgment, Gathani has not marshalled any facts to support his claim.  He has no apparent evidence of injury at this time, as he states that he "has not developed bladder cancer and has no treatment."  ECF No. 247 at 23.[16]  He has not disclosed any experts that would establish causation between his radiation exposure and his potential future bladder cancer.  *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (expert testimony required to establish causation between toxin exposure and "squamous cell carcinoma"); *Butler*

---

[16] Gathani states that he "may seek medical monitoring damages." *Id.*

*Mallinckrodt LLC*, 2022 WL 4598531 at *7 (E.D. Mo. Sep. 30, 2022) ("A case like this, alleging cancer as a result of exposure to radiation, is precisely the type of highly complex case where expert medical testimony is necessary to establish causation." (citation and internal quotation marks omitted)).

Gathani instead argues that the question of causation "was litigated in Dr. Buksh' workers' compensation cases against SVMC" and asks this Court to "stay the negligence claim until the Department [of Labor's] decision has been issued."  ECF No. 247 at 22-23.  As discussed in this Court's separate opinion partially granting the defendants' motion for summary judgment against Buksh, however, the Court will not stay the negligence where a decision was already issued in the workers' compensation case.  Accordingly, the Court dismisses Gathani's negligence claim against Sarchino without prejudice.

## VIII.   Tortious Interference (Sarchino)

Finally, Sarchino moves for summary judgment on Gathani's tortious interference claim against him.  In Vermont, a tortious interference with contractual relations involves:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Williams v. Chittenden Trust Co.*, 145 Vt. 76, 80 (1984).  Actual interference, not merely attempted interference, must be demonstrated.  *See Kneebinding Inc. v. Howell*, 2018 VT 101, ¶¶ 92-94 (affirming trial court decision holding that plaintiff failed so satisfy all the elements of its interference-with-contract claim, even though the defendant had "acted to interfere with" the contractual relationships of the plaintiff, because there was no evidence of "the needed element of damages").

In the eighth cause of action in Gathani's second amended complaint, he alleges that he entered into a written employment contract with SVMC, and that "[t]hrough his retaliatory, defamatory and abusive actions against Gathani, Sarchino tortiously interfered with Gathani's contractual relations with SVMC" and that "Sarchino performed these acts knowing that they would have an adverse impact on Gathani's contractual relations with SVMC" such that Gathani has and continues to suffer from damages.  ECF No. 124 at 15-16.  Sarchino now argues in part that "SVMC never breached the contract [with Gathani]" where the Program "never terminated him or demoted him, and never withheld or limited his pay or benefits."  ECF No. 229 at 24.

In response, Gathani states that Sarchino's "rage and malice surfaced once the plaintiffs dared to challenge him and he pursued a course of retaliation and punishment by deprivation

42

of surgical experience which caused Dr. Gathani to be constructively discharged." ECF No. 247 at 24. As explained above, the Court does not find that Gathani was constructively discharged in this case.

The Court holds that, without evidence of nonperformance of the contract between SVMC and Gathani, Gathani cannot prove his tortious interference with contractual relations claim against Sarchino. Accordingly, summary judgment is granted to Sarchino on this count. *See Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612 (1996) ("To establish liability for [tortious interference with a contract], Gifford must show that Sun Data intentionally and improperly induced Harrison Publishing not to perform its contract").

## Conclusion

For the reasons set forth above, the Court GRANTS SVMC's motion for summary judgment on the claims of retaliation, discrimination, and breach of the implied covenant of good faith and fair dealing; and the Court DENIES SVMC's motion for summary judgment on the claim of hostile work environment.

The Court also GRANTS Sarchino's motion for summary judgment in full.

43

DATED at Burlington, in the District of Vermont, this 6th day of July 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge