UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| Shazad Buksh, Krishna Gathani, Gon Saman, <br><br> Plaintiffs, <br><br> v. <br><br> Dr. William Sarchino DPM Foot and Ankle Surgeon, William Sarchino, Southwestern Vermont Medical Center, Southwestern Vermont Health Care, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> )   Case No. 2:21-cv-190 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION AND ORDER

Plaintiff Shazad Buksh ("Buksh") brought claims against defendants Southwestern Vermont Medical Center and Southwestern Vermont Health Care (collectively "SVMC"), including claims of hostile work environment, retaliation, discrimination, breach of the implied covenant of good faith and fair dealing, and abuse of process; as well as claims against defendant William Sarchino ("Sarchino") for negligence, violation of whistleblower and employment acts, and tortious interference. Both SVMC and Sarchino have moved for summary judgment. For the reasons set forth below, the Court grants in part and denies in part SVMC's motion for summary judgment, and grants in full Sarchino's motion.

## Factual Background[1]

SVMC is a domestic nonprofit corporation and regional hospital providing a variety of health care services with its principal place of business in Bennington, Vermont. SVMC operates under Southwestern Vermont Health Care with partnerships with surrounding universities and other health care institutions.

Buksh was born in Karachi, Pakistan in 1977 and moved to the United States in 1991. He mainly grew up in New York. He originally grew up Muslim and now "lean[s] a lot toward Christianity so kind of do[es] both." *See* ECF No. 244-1 at 2. He has stated that he practices his Muslim faith when he can. *Id.*

## I.  Podiatry Residency Program

From 2014 to 2022, SVMC sponsored a Podiatry Residency Program (the "Program") founded by Sarchino. Sarchino, who was an employee of SVMC, served as the Program Director and Dr.

---

[1] This factual summary is derived from the joint statement of undisputed material facts submitted by the moving parties. In responding to a movant's statement of undisputed facts, under Local Rule 56(b) a party may, if necessary, include a separate and concise statement, in numbered paragraphs, of additional material facts that the opposing party contends cannot be genuinely disputed. Because Buksh chose not to do so, this summary is based on the movants' statement of undisputed facts and Buksh's opposing statement admitting, denying, or otherwise responding to these facts. The facts are undisputed unless noted.

James Poole served as the Assistant Director.  The Program trained two residents per year over a total of three years per resident.  The parties agree that the Program has trained a diverse group of residents and that, out of the 16 total residents that the Program trained, exactly half have been non-white residents who represented a variety of racial and ethnic backgrounds.  The Program included a series of rotations in different specialties.  These rotations were typically four to five weeks in duration, and some occurred at affiliated institutions and required residents to travel to other locations.

Buksh applied for podiatric residency in 2017 through the Central Residency Interview Program. He ranked SVMC as his number one choice and matched on his first attempt.  Buksh received and signed a Physician Postgraduate Training Agreement for a 36-month podiatric residency training commencing on July 1, 2018 through June 30, 2021.  This agreement set forth the terms of the residency, including resident responsibilities, the evaluation process, and salary and benefits.  *See* ECF No. 222-9. The agreement also described the Residency Training Committee ("RTC"), stating in part that:

> SVMC has established a Residency Training Committee to evaluate the program's educational content and the progress and performance of each Resident Physician. Resident Physician shall be evaluated by attending staff physicians to whom he/she is assigned at the end of each

rotation, and these evaluations and other factors shall be considered annually by the committee. Remediation methods for unsatisfactory resident performance may be undertaken […] After each annual review, the committee will issue its determination as to whether Resident Physician performed satisfactorily and is educationally qualified to proceed in the program.

ECF No. 222-9 at 3. The agreement explained the general expectation that residents were required to "be present at the hospital from 8 a.m. to 5 p.m. Monday through Friday or at the assigned rotation hours so specified by the service. The resident physician will be on-call per the direction of the podiatric medical director." *Id.* During a rotation, the resident was supervised by and reported to an attending physician. At the completion of a rotation, the attending physician then completed an evaluation of the resident and submitted it to Sarchino. All of the attendings cared about punctuality for residents on their rotations.

Buksh also received, and signed, SVMC's Employee Guidebook as well as an acknowledgement confirming that he received, read and understood the Employee Guidebook. *See* ECF No. 222-10. The acknowledgement included the following statement: "I understand that Southwestern Vermont Health Care is an 'at will' employer." *Id.* at 2. The Employee Guidebook describes SVMC's Equal Employment Opportunity Policies, including reference to its Anti-Discrimination/Harassment and Sexual Harassment, Anti-

4

Discrimination, and Reasonable Accommodation policies.  ECF No. 222-11.

Buksh also received a copy of the Program's Podiatric Residency Training Manual.  ECF No. 222-12.  The manual identified the location of the rotations for the Program, including Saratoga, Rutland, and Albany.

In the first year of the Program, residents mostly rotate at SVMC.  In the second year, residents begin to do external rotations at other locations.  The third year is a mix of external rotations and a rotation in Bennington with Dr. McGuire.[2]

## II.  Buksh's Residency

Buksh began his residency on July 1, 2018.  He had a co-resident named Bret Fox.  Krishna Gathani and Gon Saman[3] were junior residents, one year below Buksh.

Buksh stated at his deposition that, within the first few months of his residency, he began reporting discrimination in the workplace to Poole.  *See* ECF No. 222-3 at 154.  Buksh asserts that his communications were oral, *id.* at 156, and that there were multiple conversations about preferential treatment

---

[2] The parties dispute the exact wording of the mix of external rotations in the third year, and whether it could be described as "almost entirely external rotations."  *See* ECF No. 244-1 at 13.

[3] Saman, a previous plaintiff in this case, and the defendants stipulated to dismiss his claims.  *See* ECF No. 199.

for residents that were minorities versus non-minorities, *id.* at 156-157.

On February 27, 2019, Buksh met with Sarchino and Poole and they discussed a number of issues.  After the meeting, Buksh signed a memorandum (ECF No. 222-20) which included a list of performance concerns, a few of which were "being on time for surgical cases" and "managing visits and patient questions in a reasonable time."  Buksh does not dispute the existence of the conversation or the memorandum, but he does disagree with the concerns as they apply to his performance, and he argues that there is additional background beyond what is in the memorandum. At his deposition, Buksh indicated that he felt that the memorandum was discriminatory because Sarchino was creating a narrative that Buksh was old, brown, and lazy.

On April 24, 2019, Buksh again met with Sarchino and Poole. The parties noted in a memorandum that the specific concerns from the previous meeting were still not being achieved, and that Buksh disclosed he was having trouble sleeping.  ECF No. 222-21.  Buksh contends again that the memorandum was not an accurate write up of his performance. He testified at his deposition that he resisted signing the memorandum for a month and that he had passed prior rotations with flying colors. Other residents also received feedback for "time management" in the Program.

6

The RTC met on April 25, 2019 and issued a memorandum dated May 7, 2019 to Buksh, indicating that he would need to improve in certain areas before a decision could be made to advance him to his second year of residency in the Program.  On May 22, 2019, Buksh met with Sarchino and Poole to discuss their past two meetings and his six month evaluation, and to implement an improvement plan.  The parties met for a follow-up on December 12, 2019, and at that meeting Buksh was informed that everything had improved and he was successfully taken off of the performance improvement plan.  Still, minutes from that meeting noted that tardiness and time management remained as issues.

In early January of 2020, the residents raised concerns about the Program.  The parties agree that this involved multiple meetings in January, and that one meeting was with Kevin Dailey (the Director of Human Resources at SVMC) and another with Mitch Baroody (Compliance Officer).  Buksh asserts that the first meeting was between himself and Baroody. Subsequent meetings with Baroody included Cody Anderson, Bret Fox, Gon Saman, Kurt Malkames and Krishna Gathani (it is undisputed that at least one meeting with Baroody included all of these individuals).

According to Buksh, the residents informed Dailey that Sarchino was treating them differently than other residents and non-minority residents.  The residents also complained that

7

Sarchino was pulling residents out of nonprofit rotations and putting them into for-profit rotations for his private benefit, and was sending residents to facilities with no malpractice coverage for his financial gain. The residents told Dailey that Poole told them they could be "fired any day" and that Poole would repeat the threat of firing on a monthly basis to all residents. Buksh, separately, also complained that he was sent to distant rotations as a punitive measure. Buksh also contends that he reported to Daily 10 to 15 times that Sarchino was threatening to fire him, and each time Dailey said that he was going to get back to him. Finally, Buksh informed Dailey about his concerns about the lack of x-ray protection.[4] Buksh put their numerous complaints into a document he handed to Dailey. ECF No. 222-47.

Buksh recalled, at his deposition, that in the meeting with Baroody he, Saman and Gathani raised concerns about Sarchino threatening to fire them, Sarchino removing them from surgeries, and Buksh having been put on an action plan. ECF No. 244-39 at 27-29. The residents put together a document that they gave to

_____

[4] During the Program, Buksh performed x-rays at Dr. Sarchino's offices, as well as in two other rotations during the Program. Buksh self-reported taking between 8,000 and 12,000 x-rays in Sarchino's offices over the course of his residency. Sarchino's x-ray machines recorded fewer than 3,000 images total taken at his Vermont office and 1,568 taken in his New York office; Buksh disputes that number of x-rays recorded on Sarchino's x-ray machines is reliable.

Baroody, which listed issues that the residents had raised with Dailey and Baroody. ECF 222-25. The document itself does not contain any allegations of discrimination; however, Buksh disputes any implication that discrimination was not raised at the meetings. Baroody followed up on the allegations about Sarchino directing residents to take scalpels from SVMC's operating room and bring them to his office to replenish his personal stock.

Buksh felt that Baroody was going to look into everything and that Baroody reacted in an alarmed and energetic manner when he heard about these issues. Buksh also met with Dailey after the residents met with him, and Dailey explained that he had created an action plan with Baroody and that they were very concerned about the allegations of fraudulent billing and theft of supplies, so Buksh gave additional evidence to both Baroody and Dailey on those issues.[5]

Buksh contends that during the residency Sarchino made a comment that Buksh was a "lazy Indian" between 20 to 200 times (guessing).[6] Buksh stated that Cody Anderson and Brett Fox both

---

[5] Buksh now contends that Dailey discriminated against him during his residency for, at least in part, failing to follow the EEO Policies set forth in SVMC's Employee Guidebook, and because Dailey "never really followed through" on the complaints brought to him.

[6] At his first deposition, Buksh guessed "20, 30 times. I don't know. That's just a guess. I never sat down and counted how many it was." ECF No. 222-3 at 85. At his second deposition,

witnessed Sarchino calling him a "lazy Indian," however, neither individual recalled seeing or hearing that in their depositions. Buksh also alleged that Sarchino once: "Walked up to my face and goes what did you have for dinner. And I go, what, you know, how is this an appropriate question, and I go I just made some Indian food for myself yesterday. And then he goes it's still with you. And I'm like okay. And he goes, yeah, don't do that." ECF No. 222-3 at 86. Buksh said that another time, Buksh mentioned he had been pulled over by the police and Sarchino responded something along the lines of the police saw that Buksh was not American. Buksh also stated that Sarchino was "constantly calling me old man, you know, oh are you sure you can handle this old man, you feel like you are emotionally up to this work today, it's a hard job, things like that." ECF No. 222-3 at 217.

Buksh also stated at his deposition that after he spoke to Dailey and Baroody "in the early part of 2020," Sarchino took away and/or changed the keys to his office. Certain kits and textbooks were kept in Sarchino's office. Other facts surrounding this incident are disputed. Buksh claims the chief resident told him Sarchino hated him and was telling other staff

---

he stated that Sarchino called him a "brown lazy Indian" and that he said it "multiple times. This was like a common occurrence"; he guessed that it was "A hundred, 200, you know" and a "daily occurrence." ECF No. 222-3 at 214-15.

that Buksh stole from him so he changed the locks, and that another person in the operating room confirmed this account. SVMC contends that the individuals deposed about this topic, outside of Buksh, did not remember this incident with a key in the same way Buksh recalled it.

On January 16, 2020, the RTC held a meeting that Dailey also attended.  During this meeting, the attending physicians discussed the performance of different residents. The January RTC Meeting minutes reflect that the members discussed Buksh's performance improvement plan, noted that he had shown considerable improvement, and that he had received excellent evaluations on other rotations.  However, "Dr. Daly stated that Dr. Buksh had taken some personal time off during his rotation with her and had been dishonest stating that her office was closed over the holidays during his rotation.  Dr. Buksh's rotation with Dr. Daly is, therefore, incomplete and he will need to make up time missed with Dr. Daly. Drs. Sarchino and Poole will meet with Dr. Buksh to discuss making that time up and will arrange with Dr. Daly."  ECF No. 222-29 at 2.

At the same meeting, the RTC members discussed moving the residents forward with graduation or moving up to the next year, with the understanding that "[t]hese recommendations will be in place for the next [RTC] meeting. . . barring any unforeseen circumstances."  ECF No. 222-29 at 3.  One recommendation that

11

the RTC members made by unanimous vote was that Buksh advance to his third-year of residency, pending the completion of Dr. Daly's rotation. *Id.*

From December 2-22, 2019 and then from February 3-16, 2020, Buksh was assigned to a rotation with Dr. Daly in Saratoga, New York.[7] Dr. Daly did not pass Buksh from her rotation, and noted in her assessment of him[8] that he continued to be late or missing at clinic and surgery, and would leave the clinic without telling anyone and go to eat lunch for 40 minutes. In his deposition, Buksh explained why he believed Dr. Daly's assessment was discriminatory.

Sarchino assigned Buksh to rotate with Dr. Schuh for an additional two weeks during the COVID-19 outbreak, instead of spending additional weeks with Sarchino, and Buksh points to this as discrimination. Buksh texted Sarchino on February 11, 2020, after learning that he would be sent to Schuh's rotation two weeks early, and asked why he was being sent there for 6 weeks instead of the 4 everyone else had, where he would only

---

[7] Buksh stated at his deposition that he was originally meant to be on rotation with Sarchino for four weeks, but instead he was sent to Dr. Daly for two weeks and Dr. Schuh for two weeks. These rotations were located in Rutland and Saratoga, far from Bennington, and Buksh thus contends that he did not have access to the research being performed in Bennington. Accordingly, Buksh was blocked from "publish[ing] a groundbreaking study." ECF No. 222-3 at 182-83.

[8] Buksh disputes any implication that Daly's evaluation was signed before March 24, 2020.

12

have one day of surgery and the two weeks could have been "used more effectively" on Sarchino's rotation.  ECF No. 222-48 at 4. Sarchino responded that: "my office is really crazy right now. I have one person just quit, I have an office manager has a son with cancer and is dealing with the cancer center.  And the nurse is out sick with an injury.  I'm interviewing people to take the other position and I really really need to concentrate on my office at this time, thank you for understanding."  *Id.* The parties dispute some of the circumstances surrounding this assignment.  Buksh points to excerpts from the depositions of Sarchino and Dailey: Sarchino stated in his deposition that withholding the ability to participate in surgeries would be a form of punishment as surgeries were a privilege of the residency; Dailey stated that residents had told him that Sarchino was not giving them enough surgeries and that this would be a problem for them.  Other disputed circumstances are whether Sarchino was motivated by a sincere belief that Buksh would benefit from more biomechanic work with Schuh, which Sarchino stated in the text exchange with Buksh.  *Id.* ("Yeah thought you would benefit [sic] a few more biomechanics").

Additionally, around this time, Sarchino told Buksh that he could not train with Dr. Dellenbaugh.  SVMC claims that Sarchino took this position during the COVID-19 outbreak when elective surgeries had been cancelled at the hospital where Dellenbaugh

13

worked. Buksh contends that Dellenbaugh had trauma cases, yet Sarchino still refused to allow him to train with Dellenbaugh. Buksh claims this refusal and the subsequent lack of experience hurt his chances of passing the ABFAS Board Exam.

Buksh was assigned to undertake his rotation with Dr. Schuh from March 2 until March 22, 2020. Buksh did not complete this rotation because he self-isolated due to COVID-19 exposure and/or symptoms. The parties vigorously dispute various aspects of this rotation. SVMC points to comments on Schuh's evaluation identifying her concerns with Buksh's communication skills, sterile field preparation and use, work on rheumatology treatments and diagnostic testing options, tardiness, and accuracy in preparing patient history and physical exams. Buksh contends that he "scored high in Dr. Schuh's evaluation…and she is not a credible witness for several reasons including her collaboration with Dr. Sarchino against [Buksh]." ECF No. 244-1 at 42.

On March 24, 2020, the RTC met again. At the meeting, it is undisputed that Sarchino moved to advance Buksh to the third year of his residency, provided that Buksh repeat all "H&Ps as needed," attend a remedial sterile techniques session, and commit to being on time for all assignments. Others on the committee raised concerns. *See* ECF No. 222-34. Buksh claims that "Dr. Sarchino manipulated the information provided to the

14

committee members to rile them up to take punitive action against Drs. Buksh and Saman… Dr. Sarchino was speaking privately with committee members such as Dr. Schuh to prejudice them against Dr. Buksch… [T]o cover his tracks, Dr. Sarchino who only on the day before was talking about firing Dr. Buksh, attempted to portray himself as an advocate for Dr. Buksh and create a cover for retaliation."  ECF No. 244-1 at 47.

The parties dispute what was said at the meeting.  Buksh stated at his deposition that Poole later told him "the committee went off the rails" and that Reeve told him "Dr. Sarchino along with Dr. Picket and Dr. Daly and Dr. Schuh who are people [Sarchino] employs for his other conferences all got together and said, yeah, [Buksh] is lazy, this, that, and they came up with all these drummed up excuses and said, yeah, we need to fire him."  ECF No. 222-3 at 80-83.  It is undisputed that a motion was made that Buksh not advance to his third-year of residency and that he be given the opportunity to repeat his second-year. The medical faculty voted in favor of this motion. Individuals voting included Sarchino, Pickett, Reeve,[9] and Schuh. As a result, Buksh was initially required to repeat his second year of the Program.

---

[9] Buksh emphasizes that Reeve later emailed the chair of the Grievance Committee and stated in part that those at the RTC meeting "were not provided all the information that was relevant to our decision."

15

On March 30, 2020, Sarchino signed a letter drafted by Dailey and sent it to Buksh.  The letter advised Buksh that he had not been promoted to his third year, and that there were a number of concerns about his performance including tardiness, information on clinical documentation, the need to become more familiar with rheumatology treatments and diagnostic testing options and the ACR guidelines, the need for remedial work to address insufficiencies in sterile field prep/use, and reports of disrespectful behavior and poor communication.  ECF No. 222-36.  Buksh was given the opportunity to repeat his second year, with conditions including that he be on time for all assignments; that he complete a remedial sterile field course; that he complete an additional 50 H&Ps; and that he attend a course on communication, respect and professionalism.  *Id.*

Buksh appealed this decision to the grievance committee. The grievance committee overturned the RTC's decision and Buksh moved on to his third year of the Program.  The grievance committee decision—dated May 19, 2020—imposed certain conditions on Buksh, including that he complete a course in "Communication and Respect" as well as "one month of podiatry rotation due to unsatisfactory performance on portions of two rotations in podiatric medicine."  ECF No. 222-37.  Ultimately, Buksh was not required to complete either the course or the extra month of rotations.  Buksh was required to repeat two weeks of his

rotation with Dr. Daly; however, this did not affect his graduation from the Program or his ability to take on other cases.

On or about April 27, 2020, Buksh filed a complaint with the Council on Podiatric Medical Education concerning Sarchino and SVMC.  *See* ECF No. 222-59.  Then, around May 4, 2020, Buksh filed a complaint with the U.S. Equal Employment Opportunity Commission concerning Sarchino and SVMC.[10]  Four days later, on May 8, 2020, Buksh sent a complaint to the Office of Inspector General for Medicare and Medicaid alleging that Sarchino engaged in fraudulent billing practices.  That same day, Buksh also wrote a complaint to BlueCross/BlueShield alleging the same fraudulent billing practices.  Finally, also on May 8, Buksh filed a HIPAA complaint alleging that Sarchino had sent unencrypted messages containing sensitive patient information.[11] On May 14, 2020, Buksh filed a Charge of Discrimination with the Civil Rights Unit of the Vermont Attorney General's Office.  ECF No. 222-60.  Then, on May 28, 2020, Buksh filed a VOSHA complaint concerning SVMC and Sarchino's x-ray safety practices. *See* ECF No. 222-61 (related correspondence).

---

[10] On May 14, 2021, the EEOC closed the complaint without making any findings.
[11] The HIPAA complaint was closed as being untimely filed shortly thereafter.

17

That spring, Buksh was scheduled to be on rotation with Dr. Pickett (in May and June of 2020); however, because of COVID-19 exposure he spent only around a week with Dr. Pickett.  Buksh did not pass Dr. Pickett's rotation.

In May of 2020, Buksh was considering transferring to a Medical Center in Chicago, Illinois for his third year of residency.  ECF No. 222-57 (Email from Program Director to Sarchino and subsequent emails between Dailey and Sarchino); ECF No. 222-58 at 2 (texts between Sarchino ("Do you want to transfer to Chicago?") and Buksh ("Yes sounds good-Id [sic] like a transfer.")).  Buksh contends that this discussion was never formalized into an offer from Chicago, as he changed his mind about wishing to transfer when he saw how disruptive a move would be to his family.  *See* ECF No. 244-2 at 5-6 ("[Sarchino] gave me a positive review with the Chicago program that I wanted to transfer to in May/June 2020.  There was no offer from Chicago because I withdrew my application early on in the process.  I was going to my third and final year, and realized the move to Chicago for a year would be too difficult and disruptive for my family.  I had hoped for the best at SVMC with the thought that the administration and the agencies I had complained to would send the message to Dr. Sarchino to let me have a normal year.  I was wrong about Dr. Sarchino and the deep hatred in his heart that he harbors for me.").

18

In June of 2020, Dr. Pandya hosted Buksh, then a second-year resident in the Program, in a rotation; Dr. Pandya did not pass Buksh from this rotation.  Buksh missed some of this rotation due to COVID-19 exposure or symptoms.  Additionally, there was an incident involving Buksh choosing not to stay late to perform two surgeries and an improper sharp debridement; however, Buksh disputes these incidents as they were described by Dr. Pandya and asserts that Dr. Pandya's "credibility is in question given the conflict with [Buksh]'s testimony."  ECF No. 244-1 at 64.  Pandya texted Sarchino and asked, "Is he being terminated?" and Sarchino replied, "Not yet / I would, administration doesn't favor that without convening the residents-training committee".  ECF No. 244-33.

In Buksh's last year of the residency, Bret Fox was chief resident.  Buksh stated at his deposition that Fox contributed to the retaliation against him, as directed by Sarchino, by setting up his schedule in a way that Buksh "was continuously just being told to shuffle from two rotations back and forth that were extremely far away drives for not really much of a good reason other than, oh, these were the only two I can find for you and, you know, not making the effort to try to give my side of the story."  ECF No. 222-3 at 195.  The parties agree that, pursuant to the 2020-2021 rotation schedule, both Fox and Buksh rotated in Exeter, NH (Fox for seven weeks and Buksh for

19

eight weeks) and Albany, NY (Fox for six weeks and Buksh for eight weeks). ECF No. 222-55.

Buksh completed his residency within the 36-month term and received a "Certificate of Completion" in June 2021. He remained employed by SVMC as a Resident throughout the entire term of his Physician Postgraduate Training Agreement, and he received all compensation and benefits due to him under his Physician Postgraduate Training Agreement. Buksh has acknowledged that "the Program had a strong focus on surgical procedures and he was able to meet the number of surgeries required to graduate." ECF No. 244-1 at 65. The parties also agree that Buksh completed enough surgeries to qualify for board eligibility a year before he completed the Program. ECF No. 244-1 at 65-66. The parties agree that Buksh's MAV/Diversity report, which is a document that compiles all the surgical cases that he performed in the Program at SVMC, shows that Buksh had more than the minimum required number of surgeries to graduate from the Program. However, Buksh maintains that the Program failed to give him the proper training and experience necessary to get board certification for the American Board of Foot and Ankle Surgeons. ECF No. 244-1 at 65-66 (citing ECF No. 222-3, at 176-177).

SVMC points to text messages between Buksh, Gathani and Saman. In those messages, as highlighted by SVMC, Buksh uses

20

the n-word, states "[t]hese Asians are meek son…," and calls an individual who worked in the operating room a "hoe."[12]   ECF No. 222-43; ECF No. 222-63.

Buksh took his ABFAS board exams twice but never passed them.  Buksh stated in his deposition that "based on my understanding with Dr. Dellenbaugh and my rapport with Dr. Dellenbaugh he was focusing on, you know, doing training based on board exam types of questions."  ECF No. 222-3 at 207-8. However, he "suppose[d]" that it was possible he could still have failed the board exam even if he had been given more time to work with Dr. Dellenbaugh.  *Id.*  Buksh also stated in an affidavit that:

> Dr. Sarchino did not allow me to have as much surgical experience with an orthopedic surgeon, Dr. Dellenbaugh, who had trauma cases and provided a meaningful opportunity to learn surgical skills.  SVMC's motion says that 14% of my cases were with Dr. Dellenbaugh.  To have been properly trained in surgical skills, I should have had at least 50% of my surgical experience with the type of cases handled by Dr. Dellenbaugh or someone with his type of surgical practice.  Dr. Dellenbaugh had many foot and ankle cases—more than many podiatrists.

ECF No. 244-2 at 4.  Dr. Dellenbaugh was not officially associated with the podiatric residency program, and not all residents were able to work with him.  On July 24, 2020, Buksh

---

[12] Buksh did not admit or deny these facts; he responded: "Objection as not relevant and intended to prejudice the plaintiffs.  The private text locker room talk amongst the residents is unrelated to the hostile work atmosphere created by the program director."  ECF No. 244-1 at 99-100.

21

was able to cover Dellenbaugh's cases because Dr. Relation was taking the next day off and Sarchino approved this request via text message.

After completing his residency, Buksh opened his own practice "NW Care, Incorporated" in Salem, Oregon.  He has worked there as the CEO and a podiatrist since November of 2021. His wife works with him and does the scheduling and answers calls.  NW Care, Incorporated has[13] a total of six employees, including another podiatrist.  The website for NW Care, Incorporated describes SVMC's residency program as having "a strong focus on surgical procedures along with the added credential of rearfoot reconstruction and ankle surgery," and Buksh stated at his deposition that he included this language because residents at SVMC did surgeries and there was a lot of access to surgeries.

### III. Monitoring for Bladder Cancer

On April 23, 2021, Buksh's Vermont urologist, Dr. Andrew Cowder ("Cowder"), ordered a urinalysis which revealed microscopic hematuria in Buksh's urine.  Cowder recommended a cystoscopy to rule out bladder cancer.  On May 7, 2021, Buksh underwent a cystoscopy.  The cystoscopy revealed a small papillary lesion in Buksh's bladder.  A sample of the lesion was

---

[13] As of the time of Buksh's deposition on April 9, 2024.

22

sent for testing.  Cowder had a "high clinical suspicion" of cancer and advised Buksh that "the pathology would likely come back as positive for bladder cancer, neoplasm or low malignant potential, or indeterminate."  Cowder recommended that Buksh undergo surveillance cystoscopies.  On May 10, 2021, the laboratory results came back negative for cancer, stating that the biopsied lesion was a "benign urothelium and stroma" and "negative for neoplasia."

After moving to Oregon, Buksh underwent three surveillance cystoscopies on December 15, 2021, March 16, 2022, and June 15, 2022.  All results were normal.  Buksh's provider sent his May 7, 2021 biopsy sample to Johns Hopkins Reference Laboratories for further testing.  On October 27, 2022, the laboratory results came back with a differential diagnosis of papilloma versus noninvasive low-grade papillary urothelial carcinoma. The report did not numerically quantify the likelihood of either possible diagnosis and did not diagnose Buksh with bladder cancer.

**Discussion**

**I.   Summary Judgment Standard**

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding

23

a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

## II.  Retaliation Claims (SVMC)

Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  In order to make out a *prima facie* case for a retaliation claim under Title VII, a plaintiff must show that: (1) he was engaged in a protected activity; (2) SVMC was

24

aware of that activity; (3) he was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse; and (4) there was a causal connection between the alleged adverse action and the protected activity. *See Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).

In addition to challenging Buksh's Title VII claim, SVMC is moving for summary judgment on his claims under the Healthcare Whistleblower's Protection Act ("HWPA"), Vermont's Occupational Safety and Health Act ("VOSHA"), and Vermont's Fair Employment Practices Act ("FEPA").  HWPA defines a "retaliatory action" as "discharge, threat, suspension, demotion, denial of promotion, discrimination, or other adverse employment action regarding the employee's compensation, terms, conditions, location, or privileges of employment."  21 V.S.A. § 507(a)(7).  Under VOSHA, "[n]o person shall discharge or in any manner discriminate against any employee because the employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of the employee or others of any right afforded by this chapter."  21 V.S.A. § 231(a).  FEPA makes it unlawful for an employer to "discharge or in any other manner discriminate against any employee" when the employee "has opposed any act or practice that is prohibited under this

chapter." 21 V.S.A. § 495(a)(8)(A). Neither party argues that, for the purposes of this motion for summary judgment, HWPA, VOSHA, or FEPA has a different standard or burden of proof than Title VII. *See also Gallipo v. City of Rutland*, 2005 VT 83, ¶ 15 ("Under FEPA, the standard and burdens of proof are identical to those under Title VII").

*A. Retaliatory Action*

SVMC argues that Buksh cannot show step three of his *prima facie* case: that SVMC took a retaliatory adverse action against him. Buksh disagrees, and responds that the adverse action provision under Title VII employment retaliation is more expansive than SVMC argued in its initial briefing. "The antiretaliation provision of Title VII, unlike the antidiscrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Banks v. GM, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (internal quotation marks omitted). In order to "satisfy the third element of a *prima facie* retaliation case, a plaintiff need only show that the allegedly retaliatory actions, taken either singularly or in the aggregate, were 'materially adverse'" and "would dissuade a reasonable employee from making a complaint of discrimination." *Carr*, 76 F.4th at 181.

When compared to adverse actions in the discrimination claim context, retaliatory adverse actions are both more and

less strict in different ways.  On one hand, the retaliatory actions considered may be broader and extend beyond the terms and conditions of employment.  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224-25 (E.D.N.Y. 2014).  On the other hand, anti-retaliation actions must be "materially adverse" and cause "significant" harm—a standard that the Supreme Court has not extended to Title VII's anti-discrimination provision.  *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357-58 (2024).

Earlier in this case the Court denied the defendants' motion to dismiss Buksh's claims under VOSHA, and in doing so found that the adverse actions alleged by Buksh, including "being excluded from the podiatry office, curtailed access to surgeries and other educational opportunities… [and] asking Mr. Buksh to repeat his second year of residency" were sufficient to state a claim.  ECF No. 44 at 13.  Buksh now argues, at summary judgment, that he has evidence to support these allegations because Sarchino and Dailey's "actions after their meeting show they devised a plan to retaliate and oust Drs. Buksh, Gathani and Saman," actions that Buksh complains constitute "group retaliation."  ECF No. 244 at 7.  Buksh points to the following adverse actions, which the Court considers separately and in the aggregate and summarizes below:[14]

---

[14] Buksh also points to several adverse actions that were taken against Gathani and Saman.  The Court understands that Buksh is

- Limiting Buksh's surgical experience.  Sarchino removed Buksh from a surgical rotation (with Sarchino) to an additional two weeks with Dr. Schuh on a non-surgical rotation.  Sarchino stated in his deposition that withholding the ability to participate in surgeries would be a form of punishment as surgeries were a privilege of the residency. Dailey stated that residents had told him that Sarchino was not giving them enough surgeries and that he could not dispute that this would be a problem for them.  Additionally, Sarchino limited the number of surgeries that Buksh performed with Dr. Dellenbaugh, and another resident—Fox—had twice as many surgical cases as Buksh.[15]

- The RTC decided that Buksh was required to repeat his second year of his residency.  Dr. Reeve later emailed the chair of the Grievance Committee, while the appeal

---

arguing that the actions were taken as "group retaliation to target three out of the five complaining residents by their stigmatizing features as 'one person' of Southeast Asian/Middle-Eastern ethnicity" (ECF No. 244 at 7); however, Buksh does not cite to any caselaw that states that an adverse action taken against one individual may also count as an adverse action taken against another.  So, for example, though the Court appreciates Buksh's argument that the termination of Saman adds background to the retaliatory scheme Buksh is setting forth, and takes note of that fact, the Court will not count the termination of Saman as one of the adverse actions taken against Buksh himself.
[15] Buksh does not attach a comparison of surgery logs to his response to the motion for summary judgment.  In Fox's deposition, he did testify in the following exchange:

> Q: … You were also shown your CV that says you had twice as many surgeries as required by CPME.  Do you know how many surgeries Dr. Buksh had by the time he graduated?
> A: I have no idea.
> Q: Do you know if it was on par with yours?  Twice as many or less than that?  Any idea?
> A: I—I do not because we—you know, we'd log in our own profile to log over cases, so—
> Q: All right.
> A: I don't know.

ECF No. 244-41, at 3-4.

was pending, and stated in part that "we were not provided all the information that was relevant to our decision."  Reeve also told Buksh that Sarchino had described Buksh as toxic, lazy, and that he needed to be fired.[16]

- o The Grievance Committee reversed this decision, and Buksh was not required to repeat his second year.

- Dailey drafted "for Dr. Sarchino's signature" the "disciplinary letters to Drs. Buksh and Saman."

- Sarchino "responded to a routine Residency Verification form" sent by Providence Health & Services and answered all 21 questions about Buksh's skills, experience and qualifications as "unable to assess."[17]

- Buksh was put onto a schedule of rotations that "interfered" with his research and publication, because the research was in Bennington.

- Sarchino replaced the key to his own office, where certain textbooks and supplies were kept.

- Sarchino made threats to fire Buksh.  He also texted with individuals about whether Buksh might be fired.  Pandya, who is "one of Dr. Sarchino's friends, failed Dr. Buksh in his rotation for not staying late for surgery when he told Dr. Buksh [he] could go home" and then he asked Sarchino if Buksh would be fired and Sarchino responded "Not yet, I would, administration doesn't favor that without convening the residents training committee."

---

[16] Buksh does not give any indication about how this double hearsay statement is admissible.

[17] Buksh attached this form as an exhibit to his response to SVMC's motion for summary judgment.  ECF No. 244-22.  However, the Court cannot find reference to this residency verification form in Buksh's response to the joint statement of facts.  ECF No. 244-1.

29

*See* ECF No. 244 at 7-15.

Buksh cites to *Ziparo v. CSX Transportation, Inc.*, a case in which the Second Circuit decided, under the FRSA but based upon Title VII retaliation caselaw, that "a reasonable juror could find that CSX subjected Ziparo to actions that might well have dissuaded a reasonable employee from making safety complaints" where "[a]fter Ziparo began making safety complaints, Van Blarcom's scrutiny of Ziparo intensified, Van Blarcom may have selectively brought the handbrake charge against Ziparo, Van Blarcom 'reamed' and 'chew[ed]' Ziparo out daily, and Lacy, following Van Blarcom's directive, screamed at Ziparo and threatened to fire Ziparo for insubordination."  160 F.4th 314, 340 (2d Cir. 2025).  Buksh argues that the evidence in this case is "far more compelling and a reasonable jury could readily conclude that SVMC subjected Dr. Buksh to a retaliatory work environment that might well have dissuaded a reasonable employee from making safety complaints."  ECF No. 244 at 15. However, the actions taken in this case, even considered in the aggregate, do not rise to the level found in *Ziparo*.

First, though Buksh points to SVMC's actions limiting his surgical experience, ultimately he met the number of surgeries required to graduate and even completed enough surgeries to be eligible to sit for board examinations a year before he completed the Program.  Moreover, Buksh does not appear to

dispute that he did perform surgeries with Dr. Dellenbaugh and that 14% of his cases, 42 cases, were with Dellenbaugh—including some cases after his complaints were made.[18]  Additionally, at his deposition Buksh stated that Dellenbaugh was not listed in a resident's schedule because he was "a unique category where…[he] is not officially associated with the podiatric residency program."  *See* ECF No. 244-1 at 90.  Buksh also testified that not all residents were able to work with Dr. Dellenbaugh, and that he knew that another resident had been given the opportunity to work with Dr. Dellenbaugh but did not know how many cases they worked together.  *Id.*  Thus, though the Court

---

[18] Of note, in his Response to SVMC's Statement of Undisputed Material Facts, Buksh "disputed" the statement of fact that he had performed 14% of his cases with Dellenbaugh, and cited to his affidavit.  Yet in his affidavit, he did not specifically dispute the 14%, and instead wrote only that "Dr. Sarchino did not allow me to have as much surgical experience with an orthopedic surgeon, Dr. Dellenbaugh, who had trauma cases and provided a meaningful opportunity to learn surgical skills. SVMC's motion says that 14% of my cases were with Dr. Dellenbaugh.  To have been properly trained in surgical skills, I should have had at least 50% of my surgical experience with the type of cases handled by Dr. Dellenbaugh or someone with his type of surgical practice."  ECF No. 244-2 at 4.  This statement does not appear to directly contradict that Buksh did complete 14% of his cases with Dellenbaugh.  Buksh also agrees that he was given permission by Sarchino to cover Dellenbaugh's cases on July 24, 2020.  *Id.* at 91.  Buksh's positions thus indicate that he agrees that he did perform at least some surgeries with Dellenbaugh, and to the extent that he is now attempting to deny the number of those surgeries, the Second Circuit has been clear that to survive a motion for summary judgment, non-moving parties cannot manufacture a factual dispute simply by submitting a contradictory affidavit.  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

assumes for the purpose of the motion that Buksh's access to Dellenbaugh was limited, the record does not show that it was materially limited.

Similarly, Sarchino took Buksh from a surgical rotation and assigned him to a non-surgical rotation for two additional weeks.  The Court agreed at the motion to dismiss stage that the deprivation of surgical experience could amount to an adverse action.  However, even viewing the evidence in the light most favorable to Buksh, the Court cannot say that a two-week difference in a three-year program rises to the level of materially adverse, where Buksh otherwise did receive some surgery experience before and after the Schuh non-surgical rotation.  District courts in the Second Circuit have found that "temporary reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action."  *Freeman v. Dep't of Env't Prot.*, No. 10 CV 1555 (NGG)(LB), 2013 U.S. Dist. LEXIS 31079, 2013 WL 817221 at *5 (E.D.N.Y. Feb. 5, 2013), *report and recommendation adopted*, 2013 U.S. Dist. LEXIS 31077, 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013); *see also Blake v. Developmental Servs.*, 278 F. Supp. 3d 519, 530 (D. Conn. 2017), *aff'd*, 750 F. App'x 54 (2d Cir. 2019) ("temporary transfer made pursuant to a standard procedure with no change in the Plaintiffs shifts, duties, title or pay cannot be an adverse action even for purposes of a retaliation claim");

32

*see also Oghide v. Collins*, 2026 U.S. Dist. LEXIS 73192, 2026 WL 880811, at *38 n.18 (S.D.N.Y. Mar. 31, 2026) (forcing plaintiff to work as a COVID tester, a position filled by clerical staff, did not amount to an adverse action).

The Court considers the RTC decision requiring Buksh to repeat his second year, but does so in the context of its ultimate reversal.  The Court must balance the fact that the RTC decision may have come across as discipline, with the fact that it was ultimately reversed.  *Compare Jackson v. Syracuse City Sch. Dist.*, No. 5:19-cv-1188 (AMN/TWD), 2025 U.S. Dist. LEXIS 9969, 2025 WL 255399, at *13 n. 25 (N.D.N.Y. Jan. 21, 2025) ("The fact that Plaintiff's placement at a middle school was temporary and reversed prior to her ever having to teach at the middle school, and that she agreed with her ultimate placement at a high school, indicates that there was no adverse employment action under any standard."); *Myers v. Doherty*, No. 21-cv-219, 2021 U.S. Dist. LEXIS 229215, 2021 WL 5599502, at *8, *31 (S.D.N.Y. Nov. 30, 2021), *aff'd*, No. 21-3012-CV, 2022 U.S. App. LEXIS 26982, 2022 WL 4477050 (2d Cir. Sept. 27, 2022) (explaining that there was no adverse employment action in the context of a retaliation claim because although the plaintiff was notified of a potential future transfer, the transfer did not "materialize"); *see also Durkin v. Verizon New York, Inc.*, 678 F. Supp. 2d 124, 139 (S.D.N.Y. 2009) (explaining that "[i]n

33

this Circuit, an action must actually occur to be considered an adverse employment action" and so "the threat to demote Plaintiff does not constitute an adverse employment action and therefore cannot support Plaintiff's claims of retaliation") (citing *Thomas v. Bergdorf Goodman, Inc.*, No. 03-cv-3066, 2004 U.S. Dist. LEXIS 25645, 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004)); *with Herrera v. Syracuse Univ.*, No. 5:24-cv-245 (AMN/ML), 2025 U.S. Dist. LEXIS 51098, 2025 WL 874734, at *13 (N.D.N.Y. Mar. 20, 2025) ("[A]s a general matter, a reasonable worker could be dissuaded from filing [a charge of discrimination] if she was subjected to a negative performance review or "termination" of the type described by Plaintiff."); *Millea v. Metro-North R.R.*, 658 F.3d 154, 165 (2d Cir. 2011) ("a reasonable jury could conclude that the letter of reprimand constitutes retaliation").  Here, the requirement to take a course was waived, and a decision that Buksh would need to repeat his second year was reversed.  As the Supreme Court has explained, "the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006).  In this case, an interim committee decision that was not put into effect because it was reversed on appeal does not rise to the level of an adverse action.

The Court finds that none of the other actions are materially adverse such that a reasonable juror could find that they would dissuade a reasonable employee from making a complaint of discrimination.  The changed keys to Sarchino's office, the rotations that were further away, and the threats to fire Buksh are not materially adverse.  Nor do the allegations of Sarchino's belittling remarks rise to the level of adverse action.  *See, e.g., Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 337-39 (S.D.N.Y. 2019) (finding allegations of a changed workload and "yell[ing] and scream[ing]" insufficient to withstand a motion to dismiss on a Title VII retaliation claim).  Furthermore, the Second Circuit has noted that disciplinary notices, negative job evaluations, and performance improvement plans do not usually rise to the level of an adverse employment action.  *See Weeks v. N.Y. Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001) (concluding that criticism of an employee is not an adverse employment action, and as such a "notice of discipline" did not create a materially adverse change in working conditions without more); *see also Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) ("We conclude that being instructed to follow the requirements of the Performance Improvement Plan did not constitute an adverse employment action [under Title VII].").  And though Sarchino wrote "unable to assess" on a residency verification

35

form, in order for this action to be an adverse employment action it must have been a false statement that negatively affected the plaintiff's ability to secure subsequent work. *Abreu v. N.Y.C. Police Dep't*, 329 F. App'x 296, 298 (2d Cir. 2009).

The Supreme Court has explained that Title VII's antiretaliation provision does not "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 67. Ultimately, the evidence presented at the summary judgement stage leads the Court to conclude that the adverse actions identified by Buksh—even when considered in the aggregate and in a light most favorable to Buksh as the non-moving party—do not amount to *materially* adverse actions that would dissuade a reasonable employee from making a complaint of discrimination.[19] Buksh graduated on time, received his certificate of completion, and was paid all compensation owed to

---

[19] The Court is granting summary judgment on the retaliation claims but denying summary judgment on the hostile work environment claim. This is because—as far as the Court can see based upon the record presented by the parties—the remarks that make up a large part of the hostile work environment claim were already being made before Buksh engaged in the protected activity of complaints. An adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before the plaintiff engaged in the protected activity. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

him.   The Court cannot say that the evidence marshalled by Buksh

amounted to a "materially adverse" action causing "significant"

harm that would "dissuade[] a reasonable worker from making or

supporting a charge of discrimination."  *Burlington N.*, 548 U.S.

at 63, 68.

## II.   FEPA Discrimination Claim (SVMC)

SVMC also moves for summary judgment on Buksh's claim of

discrimination under FEPA.[20]  The Vermont Supreme Court has

explained that:

> Under VFEPA, the standard and burdens of proof are
> identical to those under Title VII [of the United States
> Code].  In general, to make out a prima facie case of
> employment discrimination, the plaintiff has the burden
> of establishing four elements.  He must demonstrate
> that: (1) he was a member of the protected group; (2) he
> was qualified for the position; (3) he has suffered an
> adverse employment action; and (4) the circumstances
> surrounding this adverse employment action permit an
> inference of discrimination.  Plaintiff's burden at this
> stage is relatively light.

*Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 17 (internal

quotation marks and citations omitted).  As set forth above, an

adverse employment action in the discrimination context had

required a showing of a "material change in the terms and

conditions of employment," *id.* (quoting *Galabya v. N.Y.C. Bd. of

Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)), though the Supreme

---

[20] Buksh brings a claim of retaliation and discrimination under
FEPA, as his seventh cause of action.  *See* ECF No. 124 at 22.
Buksh did not bring a Title VII discrimination claim.

Court has more recently explained that a showing of a *material* or "significant" injury is not required (at least in the Title VII discrimination context).  *See Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024).

The Vermont Supreme Court has been clear that it accords "deference to academic institutions when they make nondiscriminatory decisions about the ethical and academic standards applicable to their students."  *Kelly*, 2022 VT at ¶ 19 (internal quotation marks omitted).  Thus, in Vermont, the decision not to extend a medical fellowship is not considered to be an adverse employment action.  *Id.* at ¶20; *see also* ¶ 27 ("In sum, UVMMC's decision not to extend plaintiff's fellowship was not an adverse employment action because it was an academic decision."); *but see* ¶ 19 ("We accord deference to academic institutions when they make **nondiscriminatory** decisions about the ethical and academic standards applicable to their students." (emphases added; internal quotation marks omitted)).

Buksh argues that he suffered adverse actions under his FEPA discrimination claim because "[f]or a resident in a 3-year program to support a family of six on a salary of $47,466 in his second year, the notion of repeating a year is a significant financial setback and cause for worry," and that he "professionally suffered from Dr. Sarchino's retaliatory discrimination with fewer surgical cases."  ECF No. 244 at 18.

38

Yet given that the RTC decision was never put into effect and Buksh was able to work on many surgical cases, Buksh has not explained how these actions amount to a "change in the terms and conditions of employment." *Galabya*, 202 F.3d at 640; *see also Myers v. Doherty*, No. 21-cv-219, 2021 U.S. Dist. LEXIS 229215, 2021 WL 5599502, at *8 (S.D.N.Y. Nov. 30, 2021), *aff'd*, No. 21-3012-CV, 2022 U.S. App. LEXIS 26982, 2022 WL 4477050 (2d Cir. Sept. 27, 2022) (explaining that there was no adverse employment action in the context of a discrimination claim because although the plaintiff was notified of a potential future transfer, the transfer did not "materialize"); *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 307 (2d Cir. 2017) ( "our holding concerns a notice of termination, and does not apply to other types of potential adverse employment actions that an employer may seek to rescind at a later date" because a notice of termination is "unlike any other types of actions. . . in that it announces the complete termination of the employment relationship"). Although the Court allowed Buksh to advance to discovery to gather evidence to support his claims, he is now only able to point to evidence that includes a decision that was reversed and a decrease in his expected surgery experience. In light of the deference given to academic institutions on decisions regarding performance of students, as well as the requirement that there be a change in the terms and conditions of employment, Buksh

39

cannot show evidence of an adverse action even when the Court draws all reasonable inferences in his favor.  *See Kelly*, 2022 VT at ¶ 25 ("UVMMC's decision not to extend plaintiff's fellowship can in no way be construed as a materially adverse change in the terms and conditions of plaintiff's employment. He was not terminated, he was not demoted, his salary was not decreased, he did not receive a less distinguished title, he did not lose any benefits, he did not suffer any diminished material employment responsibilities because he had none guaranteed after June 30, 2018." (internal quotation marks and citation omitted)).  The Court grants summary judgment on this issue for SVMC.

## III. Hostile Work Environment (SVMC)

Title VII "does not set forth a general civility code for the American workplace; but when a workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (cleaned up).  "To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

40

victim's employment." *Banks v. GM, LLC*, 81 F.4th 242, 262 (2d Cir. 2023) (internal quotation marks omitted). The Second Circuit employs "a totality of the circumstances approach to evaluate whether an environment is hostile and abusive, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "To prove a hostile work environment in violation of Title VII, a plaintiff must establish both objective and subjective elements." *Moll*, 94 F.4th at 228-29. "If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001).

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citation omitted). Generally, when "racially offensive language…is presented in a physically threatening manner," *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (internal quotations marks omitted),

41

or used consistently over a long period of time, the conduct is deemed sufficiently severe or pervasive. *Sylla v. New York City Dep't of Educ.*, 664 F. Supp. 3d 311, 325 (E.D.N.Y. 2023) (holding a reasonable jury could find the conduct was severe or pervasive when defendant "subjected plaintiff to consistent racial harassment over the course of seven years by regularly calling plaintiff 'mono' and, on one occasion, placing a banana peel in plaintiff's mop pail.").

SVMC argues that Buksh's evidence in support of his hostile environment claim is so "vague, conclusory, and contradictory" as to fail to create a "triable issue." ECF No. 222 at 19. For example, other colleagues do not recall Sarchino calling Buksh a "lazy Indian" and Buksh did not specifically list allegations about such language in his EEOC and CPME complaints. Yet what SVMC wants this Court to do is to make a credibility determination or to weigh the evidence; to credit other colleagues over Buksh or to find him not credible because he did not mention the "lazy Indian" phrase in his complaints. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and the Court finds that the evidence here, including Buksh's testimony about being called a

42

"brown lazy Indian" as a daily occurrence,[21] along with Sarchino's comment about Buksh cooking Indian food and being "not American" is enough to survive summary judgment.  *Moll*, 94 F.4th at 227.

SVMC further argues that no reasonable juror could conclude that Buksh considered these minor comments subjectively offensive, where he himself used racial slurs in texts with other residents.  However, at his deposition Buksh explained about some of the language used: "I believe it's professional and appropriate when the other person is okay with the use of that word when they have a shared similar cultural experience.  You know, sometimes people who are looking from the outside in don't really understand that because they have a privileged background, they may not be able to understand the context of these words."  ECF No. 222-3 at 27.  The Court will not grant summary judgment to SVMC on the subjective prong.  *See Pardovani v. Crown Building Maintenance Co.*, No. 15-CV-9065 (JPO), 2020 WL 2555280, at *4 (S.D.N.Y. May 20, 2020) ("It is not unheard of for in-group members to simultaneously re-appropriate racialized

---

[21] SVMC briefly argues that Buksh did not show that the alleged conduct occurred "because of" a protected characteristic, "apart from the inconsistent 'lazy Indian' claims."  ECF No. 222 at 21. The Court does not find the "lazy Indian" claims to be "inconsistent."

43

terminology for use, while maintaining an objection to its use by out-group members.").

SVMC next states that Buksh failed to take an alternative option to the program: he could have transferred in May 2020. The Court notes that in both cases cited to by SVMC, it was not the alternative option alone that supported the court's grant of summary judgment. *See Baptiste v. Lids Inc.*, 17 F. Supp. 3d 932, 951 (N.D. Cal. 2014) ("In subjective terms, plaintiff's failure to complain to any supervisor or anyone in HR about Somoon's behavior, and his decision that he preferred to stay on at Hat World because he was 'comfortable' there rather than accept Mr. Pamatmat's offer of employment at another retail establishment, cuts against any claim that Somoon's comments in July and September created an abusive environment."); *Arnold v. Reliant Bank*, 932 F. Supp. 2d 840, 855 (M.D. Tenn. 2013) (plaintiff gave a positive evaluation of her workplace and declined a more lucrative employment offer at another workplace, but: "In any event, even assuming that the subjective prong was met, the plaintiff has nonetheless failed to establish that her work environment was hostile as an objective matter."). Moreover, Buksh has stated that he withdrew from consideration by Chicago before a final offer was made, and that his withdrawal was based in part on the disruption the transfer

44

would cause to his family rather than because he preferred working at SVMC.

The Second Circuit has "repeatedly cautioned against setting the bar too high in establishing the standard for a hostile work environment claim." *Banks v. GM, LLC*, 81 F.4th 242, 268 (2d Cir. 2023) (internal quotation marks omitted). Here, viewing the evidence as a whole in the light most favorable to Buksh, the Court finds that, though "rational jurors may disagree as to whether these incidents would negatively alter the working conditions of a reasonable employee," a reasonable person could find the working environment hostile. *Moll*, 94 F.4th at 235.

## IV. Abuse of Process (SVMC)

Under Vermont law, to bring a claim for abuse of civil process Buksh must "plead and prove: (1) an illegal, improper, or unauthorized use of a court process; (2) an ulterior motive or purpose; and (3) resulting damages." *Nashef v. AADCO Med., Inc.*, 947 F. Supp. 2d 413, 420 (D. Vt. 2013) (quoting *Jacobsen v. Garzo*, 149 Vt. 205, 542 A.2d 265, 268 (1988)). Buksh's abuse of process claim centers on Defendants' interrogatory responses and their alleged failure to disclose that, according to Buksh, they communicated with federal prosecutors or law enforcement.

Previously, when deciding Buksh's motion to amend his complaint to add this abuse of process claim, the Court held in

45

part that "[w]hether the facts alleged here allow for an inference of a nefarious scheme is a close question" where the "Court previously determined that Defendants' objection to Buksh's discovery request was justified, as the reports to government officials had little to do with claims that Buksh himself had wrongfully exposed patient data. Nonetheless, it is reasonable to infer that Defendants, based upon their own alleged actions, knew of the potential for a federal felony prosecution and that Buksh was at risk of waiving his Fifth Amendment rights. Whether Defendants hid the fact of any federal reporting in their discovery responses, as well as in their Counterclaim allegations, in an effort to obtain an advantage in this litigation, remains to be proven." ECF No. 123 at 9-10.[22]

SVMC's full response to the interrogatory at issue was as follows:

> Defendants object to this Interrogatory on the grounds that it seeks information that is irrelevant. Whether Defendants reported Buksh's actions to any third party has no bearing on whether Buksh's actions were lawful.

---

[22] The previous determination mentioned here was the Court's Opinion and Order on Buksh's motion for a protective order, ECF No. 109, in which the Court held that "Buksh's desire to identify the person or persons who reported his activities to government officials does not warrant a protective order. Those identities are not relevant to Defendants' Counterclaim, which focuses purely on Buksh's conduct while at SVMC and the resulting alleged harm. The likelihood of a future prosecution is also not controlling, as the documents make clear that the federal government has closed its case." ECF No. 109 at 8.

>Subject to and without waiving the foregoing objections, Defendants refer to the documents attached hereto at SVMC_0004612-4617 and SVMC_0005688-0005689. Defendants may supplement.

ECF No. 222-64 at 10. Buksh argues that SVMC partially answered this interrogatory request by pointing to produced documents, without clarifying that they were also withholding information on the basis of their objections. It is not proper to expect the other party to guess at whether any documents have been withheld. "A response with 'subject to and without waiving waiting these objections…' can confuse or mislead the requesting party as to whether the responding party has fully or only partially responded to the discovery request." *Sandigo v. Ocwen Loan Servicing, LLC*, No. 17-cv-002727, 2018 WL 4293339, 2018 U.S. Dist. LEXIS 157236, *6-7 (N.D. Cal. July 18, 2018); *see also Peters v. Boehringer-Ingelheim Pharmaceuticals, Inc.*, No. 6:15-cv-694, 2015 WL 7721328, at *2 (M.D. Fla. Nov. 30, 2015) ("[I]f a party has a sustainable objection to all or part of a discovery request it may make that objection. But, if the objection is to only part of the discovery request then the objecting party must make clear that it is only providing a partial response." ); *Source Network Sales & Marketing, LLC v. Jiangsu Mega Motor Co.*, No. 3:16-cv-1202-B-BK, 2017 WL 7596913, at *4 (N.D. Texas, May 15, 2017); *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-125, 2019 WL 12323321,

at *5 n.3 (D. Vt. Jun. 10, 2019) (discussing conditional boilerplate objections).  This is obfuscation is why the Court allowed Buksh to amend his complaint.

At this stage in the litigation, however, Buksh has not produced any evidence that would allow the Court to reasonably infer that the defendants hid the fact of any federal reporting in their discovery responses.  Even viewing the evidence in the light most favorable to Buksh, the incomplete discovery responses do not, without more, rise to the level of an illegal, improper, or unauthorized use of a court process. Buksh cites to other facts that, he argues, support his claim: SVMC waived service in this pending case in September of 2021, and approximately 22 days later Baroody reached out to the FBI to report alleged personal health information theft by Buksh and this original email was not produced until "threat of a motion;" Baroody soon mentioned in internal emails that it was "relatively rare, so very cool" that the Department of Homeland Security would soon have a detachment at the Bennington Station and that this "would be helpful in working through this case" and that a detective with the Burlington Police Department told him that "extradition would be difficult west of the Mississippi!".[23]  The Court finds that these additional facts,

---

[23] SVMC, on the other hand, attached a declaration from attorney Frederick David Harlow, in which he stated that he did not hide

48

however, are not enough show that SVMC had an illegal, improper, or unauthorized use of a court process in its incomplete discovery answers with an ulterior motive or purpose.

Additionally, Buksh has not produced any evidence of damages specific to the discovery abuse.  SVMC argues that, to the extent Buksh is attempting to premise his abuse of process claim upon SVMC's police and FBI reports themselves, such a claim would run contrary to Vermont law and policy because an absolute privilege protects "public interest in free and full disclosure to law enforcement of information concerning criminal activity."  *Talandar v. Manchester Murphy*, 2024 VT 86, ¶ 22. This Court allowed Buksh to amend his complaint to add an abuse of process claim based upon SVMC's discovery responses, not based upon its reporting to law enforcement—reports which this Court has already indicated are irrelevant.[24]  Buksh may not base his claims upon the making of the reports themselves; rather, his claims of damages must relate to the abuse of process (which in this case consists of the discovery responses).  However, Buksh cites as his damages the emotional difficulty he suffered

---

any information or hold an ulterior motive in responding to the interrogatory.  ECF No. 222-64.

[24] At the motion to dismiss stage, the Court allowed Buksh's claim to proceed based upon his allegations of emotional distress caused by exposure to a federal criminal investigation, where Buksh cited a host of cases allowing mental suffering damages arising from an abuse of process claim.  ECF No. 123 at 11.

49

based upon his testimony at his deposition (at which he was able to assert his Fifth Amendment right) as well as the reports themselves, rather than the incomplete discovery responses at issue here.  Buksh wrote that he had "no notion of asserting his Fifth Amendment right in my deposition" until he learned of the criminal complaint, at which point "I would have certainly, and in fact did, assert my privilege at my deposition."  ECF No. 244-2 at 7.  Buksh also wrote that "SVMC's plan was to take away my liberty and cause my family and I considerable difficulty"; that "SVMC succeeded in inflicting on me and my family considerable anxiety and worry about the criminal complaint" and that it has "caused so much personal grief, worry and sleepless nights."  *Id.* at 8.  However, this emotional distress relates to the criminal complaints and reports themselves, not the interrogatory response that this Court allowed Buksh to base an amendment of his complaint upon. Buksh has submitted no evidence of the damages caused by the incomplete discovery responses themselves.

The Court holds that, even drawing all reasonable inferences for Buksh, he has not shown evidence of an improper use of a court process; nor has he shown damages.  The Court grants SVMC's motion for summary judgment on the abuse of process claim.

**V. Good Faith and Fair Dealing (SVMC)**

SVMC asks this Court to dismiss Buksh's claim of breach of the covenant of good faith and fair dealing, because Buksh's employment was at-will.  ECF No. 222 at 24.  The Vermont Supreme Court has expressly "decline[d] to recognize the implied covenant of good faith and fair dealing as a means of recovery where the employment relationship is unmodified and at-will." *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 23 (1995); *Dicks v. Jensen*, 172 Vt. 43, 52 (2001); *Boynton v. ClearChoiceMD, MSO, LLC*, 2019 VT 49, ¶6 ("Because plaintiff was an at-will employee and she has admitted on appeal that the handbook does not modify her status as an at-will employee, her argument that defendants violated the covenant of good faith and fair dealing by terminating her for a pretextual reason fails.").

Buksh responds that the employment contract was not at-will because there was a termination provision that required due process.[25]  The provision states:

> XIII. Termination
>
> XIII-1.  This Agreement may be terminated subject to the due process opportunity extended to the Resident Physician under the provisions of the residency program's Grievance Policy then in effect, if the

---

[25] Buksh cited to Docket Number 223-9, page 6, as support for the existence of this termination provision.  *See* ECF No. 244 at 23.  The Court has examined this document, the "Employee Guidebook," and it does not contain a termination provision on page 6 and in fact at multiple points the document stresses that the employment is at-will.  The Court assumes that Buksh meant to cite to Docket Number 222-9, page 6, the "Physician Postgraduate Training Agreement" that does discuss termination on page 6.

Program Director determines the Resident Physician has failed to remain in compliance with the conditions of his/her appointment under this Agreement or with applicable SVMC policies, or

XIII-2.    Either party pay [sic] terminate this Agreement, without cause, by giving the other party 90 days advance written notice of termination subject to the Resident Physician at his/her option being able to complete the balance of the annual contract year of his/her Agreement, or at SVMC's election compensating the Resident Physician for the balance of his/her contract year under this Agreement.

ECF No. 222-9 at 6.  It is true that "the presumption of an at-will employment contract is a rule of contract construction that can be overcome by evidence to the contrary," including by the institution of "company-wide personnel policies."  *Ross*, 164 Vt. at 19-20; *see also Kubler v. Heritage Auto. Grp., Inc.*, No. 5:16-cv-180, 2017 WL 3730884,  2017 U.S. Dist. LEXIS 187998, at *50-51 (D. Vt. June 14, 2017).  However, Buksh relied upon the due process provision above without addressing the second clause, allowing for termination without cause so long as notice and an option was given to the resident.  Yet this second provision is important.  When confronted with an even longer notice period of 180 days, the Vermont Supreme Court has explained: "While the agreement at issue here is not truly at-will in the sense that there is a written contract that requires a notice period before no-cause termination, we have treated them as equivalents" because "the agreement still left the employer with the power to fire [the employee] with or without

52

cause." *LoPresti v. Rutland Reg'l Health Servs.*, 2004 VT 105, ¶ 18 (internal quotation marks omitted); ¶ 39.  Under similar reasoning, Buksh was in an equivalent at-will employment contract under which he may not bring a claim for a breach of the covenant of good faith and fair dealing.

Moreover, Buksh argues that SVMC has breached the covenant exclusively through its retaliatory actions.  ECF No. 244 at 23 ("[T]here is no promise in the contract that SVMC will not retaliate.  The retaliatory conduct by SVMC constituted the breach of the covenant as it defeated the common purpose and justified expectation of Dr. Buksh.").  This argument brings with it a new issue, because the Vermont Supreme Court has declined to recognize claims for breach of the covenant of good faith and fair dealing where they overlap with public policy claims or retaliation claims.  *Cole v. Foxmar Inc.*, 387 F. Supp. 3d 370, 384 (D. Vt. 2019) ("Because Plaintiff's claim that he was terminated in violation of public policy is governed by VOSHA which creates a statutory cause of action, any common law claim based on the same facts and alleging the same legal theory of recovery is preempted."); *Murray v. St. Michael's College*, 164 Vt. 205, 212 (1995) ("Because the bases of this claim are essentially the same as those supporting plaintiff's actionable discrimination claim under § 710(b), the claim is superfluous, and thus we uphold its dismissal.").  The same reasoning leads

53

this Court to find that Buksh's retaliation claims would preempt his covenant of good faith and fair dealing claims, where "under Vermont law, where a statute creates a right or remedy unknown at common law, the statutory remedy preempts a common law cause of action," *Boule v. Pike Indus.*, No. 5:12-cv-7, 2013 WL 711937, 2013 U.S. Dist. LEXIS 26588, at *68 (D. Vt. Feb. 27, 2013).

## VI. Economic Damages (SVMC)

The Court does not reach SVMC's argument that Buksh cannot establish economic damages as a matter of law.  SVMC did not tailor this argument to specific claims as brought by Buksh, and because not all of the claims require economic harm it is not clear how this argument would provide a path to summary judgment for SVMC.  *See, e.g., Banks v. GM, LLC*, 81 F.4th 242, 270 (2d Cir. 2023) ("Nor is economic harm required for an employment decision to be actionable under Title VII.").

## VII. Negligence (Sarchino)

Buksh alleges that Sarchino "breached the standard of ordinary care" by exposing residents (including Buksh) to dangerous levels of radiation when they were ordered to take x-rays at Sarchino's private practice "without proper protection or monitoring" and, as "a direct and proximate result of Sarchino's actions" Buksh suffers from damages "including those related to bladder cancer."  ECF No. 124 at 22.  Sarchino now

54

moves for summary judgment, arguing that Buksh cannot prove negligence under Vermont law for several reasons including that Buksh has not produced evidence he suffered any injury.

In Vermont, one of the four elements of a prima facie negligence claim is "actual injury to the plaintiff" where an "actual injury… most often equates to physical injuries." *Ethridge v. Comcast Corp.*, 2024 VT 16 at ¶ 33 (case in which the Vermont Supreme Court affirmed a grant of summary judgment where the only injury alleged was PTSD, which was categorized as a mental or emotional harm, not a physical harm, and thus was insufficient to satisfy the actual injury requirement). As explained above, here Buksh has alleged damages "including those related to bladder cancer." Bladder cancer would satisfy the "actual injury" requirement of negligence. However, as Sarchino points out, there does not appear to be any evidence that Buksh has bladder cancer.

Buksh agrees that the following facts are undisputed:

• On April 23, 2021, Buksh saw his Vermont urologist, Dr. Andrew Cowder ("Cowder"), complaining of hematuria (blood in the urine) and erectile dysfunction. Cowder ordered a urinalysis, which revealed microscopic hematuria in Buksh's urine. Cowder recommended a cystoscopy to rule out bladder cancer.

• On May 7, 2021, Buksh underwent a cystoscopy. The cystoscopy revealed a small papillary lesion in Buksh's bladder. A sample of the lesion was sent for testing. Cowder had a "high clinical suspicion" of cancer and advised Buksh that "the pathology would likely come back as positive for bladder cancer, neoplasm or low

malignant potential, or indeterminate." Cowder recommended that Buksh undergo surveillance cystoscopies. However, the medical records do not show that Cowder diagnosed Buksh with bladder cancer.

- • On May 10, 2021, the laboratory results came back negative for cancer, stating that the biopsied lesion was a "benign urothelium and stroma" and "negative for neoplasia."

- • Upon moving to Oregon, Buksh began using Willamette Urology PC as his new urologist. Buksh underwent three surveillance cystoscopies on December 15, 2021, March 16, 2022, and June 15, 2022. All results were normal.

- • On October 2022, Willamette sent the May 7, 2021 biopsy sample to Johns Hopkins Reference Laboratories for further testing.

- • On October 27, 2022, the laboratory results came back with a differential diagnosis of papilloma versus noninvasive low-grade papillary urothelial carcinoma. The report did not numerically quantify the likelihood of either possible diagnosis and did not diagnose Buksh with bladder cancer.

ECF No. 244-1 at 107-109. Again, Buksh agrees that all of these facts are undisputed, and Buksh chose not to file an additional statement of facts for Sarchino to respond to in turn.

Buksh has separately filed an affidavit, in which he stated that he "completed the SVMC residency program in June 2021 but did so at the cost of" his "health with a diagnosis of bladder cancer linked to x-ray radiation exposure." ECF No. 245-2 at 1. Buksh does not explain where the diagnosis is from. Perhaps he means the "differential diagnosis" of "papilloma versus noninvasive low-grade papillary urothelial carcinoma." However,

56

Buksh agreed that it was undisputed that the laboratory results that contained the differential diagnosis "did not diagnose Buksh with bladder cancer."  Buksh also wrote in his affidavit that:

> I have been undergoing monitoring cystoscopy since the discovery of lesions in my bladder by a urologist at SVMC on May 7, 2021, that he was shocked to find given my age, personal and family history.  I testified at length about my medical course as outlined in my proposed findings that were filed with the Department of Labor and the Judge who heard this matter in early June 2025. . . . A pathology report I obtained from Johns Hopkins on October 27, 2022, provided a differential diagnosis of benign or cancer.  As I do not have the risk factors for bladder cancer other than my x-ray exposure at SVMC, my treating physicians as well as Dr. Beron, my expert radiology oncologist, have recommended continuing cystoscopy monitoring which I have complied with though it is an uncomfortable procedure.  At the hearing, even SVMC's expert pathologist, Dr. Swedarsky agreed that the monitoring cystoscopy plan was appropriate with the differential diagnosis despite his conclusion that the lesions were likely benign.  I have been continuing with the monitoring and so far it has been negative but my physicians and I remain concerned that the cancer will return as I age.  As noted in my proposed findings, the x-ray data produced several times by Dr. Sarchino with screen shots of the dates and numbers of x-rays taken at his office, are inconsistent.  There is clear evidence when the different sets of the screen shots are compared that the data was tampered with.

ECF No. 245-2 at 8-9.  Again, this affidavit does not make it clear that Buksh has ever been diagnosed with cancer.  Moreover, to the extent that Buksh meant for Dr. Beron's expert report to affirmatively diagnose him with cancer, the Court has ruled that the expert report be excluded in a separate order.

57

Of note, in his response to the motion for summary judgment, Buksh does not affirmatively set forth evidence to support the injury prong of his prima facie negligence claim. Rather, he informs that Court that the "outcome of the workers' compensation hearing will be determinative of the issues of causation and injury" and asks the Court to stay the claim. ECF No. 245 at 23-24. However, as the Court explained in its separate order on the motion to exclude Beron's expert opinion, the Court will not stay the negligence claim because a decision was already issued in the workers' compensation case and because it is more efficient for the Court and the parties to consider these motions now. *See Loftus v. Signpost, Inc.*, 464 F. Supp. 3d 524, 526 (S.D.N.Y. 2020) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012)(a "district court's 'power to stay proceedings is incidental to the power inherent in every court to control the disposition of the case on its docket with economy of time and effort for itself, for counsel, and for litigants.'").

To summarize: Buksh has based his claim of negligence upon the injury of his bladder cancer, but he has not produced enough evidence of a diagnosis of bladder cancer to create a genuine issue of material fact. Rather than pointing this Court to evidence of his diagnosis of bladder cancer, Buksh has asked this Court to stay the negligence claim. The Court declines to

do so.  Accordingly, the Court dismisses Buksh's negligence claim against Sarchino without prejudice.

## VIII. Retaliation (Sarchino)

Sarchino also moves for summary judgment on Buksh's FEPA claim against him, arguing in part that "Buksh cannot prove Sarchino violated FEPA by retaliating or discriminating against him because Buksh never suffered any adverse employment actions."  ECF No. 228 at 17.  Buksh's response is that he did suffer the adverse employment actions of being excluded from the podiatry office, curtailed access to surgeries and other educational opportunities, and asking Buksh to repeat his second year of residence.  ECF No. 245 at 20.  However, for the reasons set forth above when addressing SVMC's claims, the Court finds that there is not enough evidence of an adverse action taken against Buksh for his claims to survive summary judgment.

Similarly, Sarchino moves for summary judgment on Buksh's VOSHA whistleblower retaliation claim against him, and Buksh has responded in part by detailing the retaliatory adverse actions caused by Sarchino, ECF No. 245 at 5-16.  Again, for the reasons set forth above, the Court finds that there is not enough evidence of an adverse action taken by Sarchino against Buksh for Buksh's claims to survive summary judgment.

The Court grants summary judgment to Sarchino on Buksh's FEPA and VOSHA claims.

## IX. Tortious Interference (Sarchino)

Finally, Sarchino moves for summary judgment on Buksh's tortious interference claim against him.  In Vermont, a tortious interference with contractual relations involves:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Williams v. Chittenden Trust Co.*, 145 Vt. 76, 80 (1984).  Actual interference, not merely attempted interference, must be demonstrated.  *See Kneebinding Inc. v. Howell*, 2018 VT 101, ¶¶ 92-94 (affirming trial court decision holding that plaintiff failed to satisfy all the elements of its interference-with-contract claim, even though the defendant had "acted to interfere with" the contractual relationships of the plaintiff, because there was no evidence of "the needed element of damages").

In the eighth cause of action in Buksh's second amended complaint, he alleges that he entered into a written employment contract with SVMC, and that "[t]hrough his retaliatory, defamatory and abusive actions against Buksh, Sarchino tortiously interfered with Buksh's contractual relations with SVMC" and that "Sarchino performed these acts knowing that they would have an adverse impact on Buksh's contractual relations

60

with SVMC" such that Buksh has and continues to suffer from damages.  ECF No. 124 at 22-23.  Sarchino now argues in part that "SVMC never breached its contract with [Buksh]" where he "admits he remained employed with SVMC throughout the entire Program and received all compensation and benefits due under the Training Agreement" and "concedes he completed the Program and graduated on time with all required credits."  ECF No. 228 at 25.

In response, Buksh does not clarify which part of the contract Sarchino induced or caused SVMC to fail to perform. Buksh does state that "Dr. Sarchino continued to interfere with Dr. Buksh's contractual opportunities after he graduated by the torpedoing [sic] his credentialing with Providence Health in Oregon."  ECF No. 245 at 24.  However, he does not elaborate on what damages may have followed from this statement, or how Sarchino marking Buksh as "unable to evaluate" could constitute a tortious interference claim.

The Court holds that, without evidence of nonperformance of the contract between SVMC and Buksh, Buksh cannot prove his tortious interference with contractual relations claim against Sarchino.  Accordingly, summary judgment is granted to Sarchino on this count.  *See Gifford v. Sun Data, Inc.*, 165 Vt. 611, 612 (1996) ("To establish liability for [tortious interference with a contract], Gifford must show that Sun Data intentionally and

61

improperly induced Harrison Publishing not to perform its contract").

### Conclusion

For the reasons set forth above, the Court GRANTS SVMC's motion for summary judgment on the claims of retaliation, discrimination, abuse of process, and breach of the implied covenant of good faith and fair dealing; and the Court DENIES SVMC's motion for summary judgment on the claim of hostile work environment.  The Court also GRANTS Sarchino's motion for summary judgment in full.

DATED at Burlington, in the District of Vermont, this 13th day of July 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge